798 P.2d 1308

**Earl M. BURKONS, Plaintiff–Appellant,**

**v.**

**TICOR TITLE INSURANCE COMPANY OF CALIFORNIA, a California corporation, Defendant–Appellee.**

**No. 1 CA–CIV 9775.**

Court of Appeals of Arizona,
Division 1, Department C.

Dec. 21, 1989.

Reconsideration Denied
June 8, 1990.

Review Granted Nov. 6, 1990.

Jennings, Strouss & Salmon by Timothy W. Barton, Jefferson L. Lankford, Michael R. Palumbo, and Carol A. Cluff, Phoenix, for plaintiff-appellant.

Streich, Lang, Weeks & Cardon by Robert E. Miles, Marcia Horn Yavitz, and E. Jeffrey Walsh, Phoenix, for defendant-appellee.

## OPINION

GRANT, Chief Judge.

This is an appeal from summary judgment in favor of a title company on claims against it for breach of an escrow contract and breach of fiduciary duties, and from dismissal for failure to state a claim of bad faith breach of contract.

## FACTS

Earl M. Burkons provided his brother-in-law, Arthur Schnitzer, with a power of attorney to sell Burkons' real property located in Phoenix. In 1983 Schnitzer agreed, on behalf of Burkons, to sell the property for $135,000 to "Pyramid I", an Arizona joint venture composed of Mark R. Masias, Dr. Dennis Noss and Domenico Spano (Pyramid). The written contract provided that Burkons would receive a $1,000 earnest money deposit, a $24,000 cash down payment and a $110,000 carryback promissory note and deed of trust. The contract also provided that the escrow would contain a subordination agreement and letter of intent. Schnitzer acted as Burkons' attorney-in-fact in the transaction. Neither Burkons nor Schnitzer was sophisticated in real estate matters, nor were they represented by legal counsel.

The parties employed Ticor Title Insurance Company of California, a California corporation (Ticor), to handle the escrow, and Ticor's escrow officer, Joyce Yancy, prepared the escrow instructions. The escrow instructions recited the purchase price of $135,000, with a $25,000 cash down payment and the balance of a $110,000 promissory note secured by a first lien deed of trust. The escrow instructions prohibited the buyer from placing "another lien of any type against this property without written permission from the Seller." The escrow instructions further stated that the seller (Burkons) was to accept a subordination agreement and letters of intent with financial statement in writing before the escrow closed.

Pursuant to the escrow instructions, the buyers prepared the letter of intent [1] which described the buyers' plan to construct a medical complex on the property and reflected the parties' understanding that the buyers would finance the construction by obtaining a loan separate and apart from the money used to purchase the property. The letter of intent assured Burkons that subordination of his loan to the loan obtained for construction would be nominal—"approximately 50% of [the] selling price."

---

1. That letter states:

Rev. Domenico Spano and Dr. Dennis B. Noss formed a joint venture to construct a medical complex on the project mentioned. We, therefore, intend to start construction as soon as approval is met.

We have contracted for the property to be carefully masterplanned by Frank Clemente and Associates (955-0740), of Phoenix, Arizona, and hope our site plan is ready by December 1, 1983.

Because of our building methods, subordination will be minimal, approximately 50% of selling price.

The construction of improvements was critical; it would increase the value of the property, and thereby provide adequate security for both the construction lender and Burkons.

The buyers obtained a $67,000 loan from Tower Acceptance and Service Corporation (Tower) and prepared a subordination agreement which specifically incorporated the aforementioned letter of intent. Only the amount to which Burkons would be subordinated, $67,000, was filled in on the otherwise blank form. Although Ticor did not handle the escrow for the buyer's loan, Ticor's agent later completed the subordination agreement form, adding such terms as the identity of the lender, the interest rate, the payment terms, and the due date. Neither Burkons nor Schnitzer was consulted or notified about these terms. The buyers' real estate agent, George Stika, had previously obtained Schnitzer's signature on the essentially blank subordination form before it was filled in by Ticor.

Schnitzer died before the parties to this litigation had an opportunity to question him. Thus, the only evidence concerning conversations between Stika and Schnitzer comes from Stika, the buyers' real estate agent. Stika testified at deposition that he explained to Schnitzer that, as a result of the subordination, Burkons' deed of trust would be in second position. According to Stika, Schnitzer responded that he knew what a subordination agreement was. Stika also testified that he informed Schnitzer that the blanks in the partially completed subordination agreement would be filled in before the escrow closed or before the agreement was recorded. Again, according to Stika, Schnitzer responded that he understood.

Yancy, the escrow officer, was aware prior to closing of escrow that the combined deeds of trust on the property—the $110,000 lien plus the $67,000 lien—were greater than the $135,000 purchase price. She was concerned that this overencumbrance might violate the internal Ticor policy against handling escrows in which liens on the property exceeded the sales price. She consulted Ticor's senior advisory escrow officer, Lee Vrooman, who told her that, because the internal policy was inapplicable to the Burkons escrow, Yancy should proceed with processing the escrow. The Burkons escrow was the fourth in a series of seven escrows Ticor handled involving Pyramid, and each was overencumbered.

Escrow closed on January 5, 1984. Ticor received $46,705.69 in loan proceeds from another title company acting for the buyers to deposit into escrow. Ticor applied $24,000 of these loan proceeds toward the down payment and turned over the remainder of these funds to the buyer, minus certain costs and escrow fees. A settlement statement prepared by Yancy reflected that the money used to make the down payment was, in fact, taken from the Tower loan to which Burkons had been subordinated. In other words, the "construction loan" money was used for *purchase* rather than *improvement* of the property. Yancy did not inform Burkons or Schnitzer of either the overencumbrance or the source of the down payment.

Ticor filed the escrow documents in the following order: construction loan deed, Burkons' deed, the subordination agreement, and the letter of intent. As a result of the order in which the documents were filed, the Burkons' deed of trust was in second position to the "construction loan," not simply as a result of the subordination agreement, but also as a result of recording order. Ticor's fee for its services was $240.25.

Pyramid failed to improve the property and eventually defaulted on the promissory note payments to Burkons. Sixteen months after close of escrow, Burkons filed suit against Ticor. Count I alleged Ticor breached the escrow contract for recording the deed in the wrong order, subordinating Burkons' deed to other than a construction loan, and filling in the blanks on the subordination agreement without authority; Count II alleged that Ticor breached a fiduciary duty for failure to follow escrow instructions; Count III alleged that Ticor breached a fiduciary duty for failure to disclose a known fraud; Count IV alleged

that Ticor committed bad faith breach of contract; and Count V sought damages for emotional and mental distress.

## PROCEDURAL HISTORY

Burkons filed his complaint on April 26, 1985. Ticor answered on June 10, 1985, denying all counts. Burkons moved to consolidate his case (C–543017) with related cases (*Manley v. Ticor Title Ins. Co.*, C–540936; *Cline v. Ticor Title Ins. Co.*, C–546020; and *Dickens v. Ticor Title Ins. Co.*, C–550494), but the motion was granted only for pretrial purposes.[2]

On August 6, 1986 Ticor filed a motion for summary judgment on Counts I, II, III, and V of Burkons' complaint. Count IV, the bad faith claim, was earlier dismissed for failure to state a claim. On September 9th the trial court granted summary judgment with respect to Counts III and V of the complaint and denied summary judgment on Counts I and II. Both sides filed motions for reconsideration of their respective positions, and on March 20, 1987, the court granted Ticor's motion for summary judgment on Counts I and II and denied Burkons' motion for reconsideration of Count III. Final judgment was entered on July 7, 1987, dismissing all of Burkons' claims against Ticor and awarding Ticor $35,000 in attorney's fees. Burkons filed a timely notice of appeal on July 17, 1987.

## ISSUES PRESENTED

On appeal, Burkons contends that the trial court erred in granting summary judgment for Ticor on the questions whether Ticor breached its fiduciary duty and whether Ticor breached the escrow contract. Burkons also contends that the trial court erred by finding that Ticor was not liable in tort for intentional breach of the implied covenant of good faith.

## STANDARD OF REVIEW

It is well established that summary judgment may be granted only if there is no genuine dispute as to any material fact, if only one inference can be drawn from the facts, and if the moving party is entitled to judgment as a matter of law. *Nicoletti v. Westcor, Inc.*, 131 Ariz. 140, 142, 639 P.2d 330, 332 (1982). On appeal from a grant of summary judgment, we must view the evidence in the light most favorable to the party opposing the motion. *State ex rel. Corbin v. Challenge, Inc.*, 151 Ariz. 20, 24, 725 P.2d 727, 731 (App.1986).

This court is free to substitute its analysis of the record for the trial court's where the case turns upon the interpretation applicable to undisputed facts. *Goodyear Aircraft Corp. v. Arizona State Tax Comm'n*, 1 Ariz.App. 302, 303, 402 P.2d 423, 424 (1965). Interpretation of legal instruments is also a question of law to be determined by this court independent of the trial court's findings. *LeBaron v. Crismon*, 100 Ariz. 206, 208, 412 P.2d 705, 706 (1966); *Stika v. Albion*, 150 Ariz. 521, 523, 724 P.2d 607, 609 (App.1986).

## DUTY OF ESCROW AGENTS

The law is well settled that escrow agents owe a fiduciary duty to their clients. Fiduciary relationships are of two types: 1) those specifically created by contract or formal legal proceedings, and 2) those implied in law due to the factual situation surrounding the transaction and the relationship of the parties. *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235, 1241 (1982). An escrow relationship is of the first type and, in Arizona, in the absence of a contract, an escrow agent owes no fiduciary duty. *Engler v. Sainer*, 4 Ariz.App. 86, 88, 417 P.2d 720, 722 (1966). In its fiduciary capacity the escrow agent must conduct the affairs with which he or she is entrusted with

---

2. *Manley v. Ticor*, C–540936, *Burkons v. Ticor*, C–543017, *Cline v. Ticor*, C–546020, and *Dickens v. Ticor*, C–550494, were consolidated for pretrial purposes on February 21, 1986. *Cline v. Ticor* was dismissed on July 1, 1986, for failure to prosecute. It was refiled under cause number C–588884 on August 1, 1986, and on November-ber 7, 1986, plaintiffs moved to consolidate it with the three other cases. That motion was denied on December 12, 1986. Also on December 12, 1986, the court on its own severed *Burkons v. Ticor*, cause number C–543017, from the other two cases and reassigned *Burkons* to another judge (minute entry, December 12, 1986).

scrupulous honesty, skill and diligence. *Berry v. McLeod,* 124 Ariz. 346, 351, 604 P.2d 610, 615 (1979); *Tucson Title Ins. Co. v. D'Ascoli,* 94 Ariz. 230, 234, 383 P.2d 119, 121–22 (1963); *Buffington v. Title Ins. Co.,* 26 Ariz.App. 97, 99, 546 P.2d 366, 368 (1976); *see also National Bank v. Equity Investors,* 81 Wash.2d 886, 910, 506 P.2d 20, 35 (1973) (an escrow agent occupies a fiduciary relationship to all parties to the escrow, and owes a fiduciary duty to the principals in the same way that all agents are held to such standards); *Restatement (Second) of Agency,* § 14D (1958).[3]

Prior to 1979, Arizona courts had limited the fiduciary duties of an escrow agent to duties consistent with general agency doctrine: strict compliance with the implied or express terms of the escrow agreement, including disclosure of information required thereby. *Shaheen v. American Title Ins. Co.,* 120 Ariz. 505, 508, 586 P.2d 1317, 1320 (1978); *see Berry v. McLeod,* 124 Ariz. 346, 352, 604 P.2d 610, 616 (1979). However, in *Berry v. McLeod,* the Arizona Supreme Court expanded the fiduciary duties owed by an escrow agent. *Escrowee's Duty to Disclose Fraud: An Expansion of the Limited Agency Doctrine,* 22 Ariz.L.Rev. 1146, 1146 (1980) [hereinafter *Escrowee's Duty* ].

The *Berry* court held that an escrow agent has a duty to disclose to his principal any knowledge about the commission of fraud by a party to the escrow, regardless of whether the escrow instructions contain terms requiring such disclosure, if silence would assist the perpetration of the fraud. *Berry,* 124 Ariz. at 352, 604 P.2d at 616. In the case before us, Burkons alleges two counts of breach of fiduciary duty: one count arising from Ticor's failure to disclose a fraud and another arising from Ticor's failure to follow the escrow instructions. Because the latter breach of fiduciary duty count arises from the same facts as the separate breach of contract count, the two will be discussed together.

## TICOR'S BREACH OF CONTRACT AND FIDUCIARY DUTY FOR FAILURE TO FOLLOW ESCROW INSTRUCTIONS

We hold that the trial court erred in granting Ticor's motion for summary judgment on the allegations of breach of contract and breach of fiduciary duty for failure to follow escrow instructions. We believe that the trial court did not fully consider the nature and purpose of the parties' relationship.

Parties to an escrow agreement have as their dominant objective the protection of their interest in the real estate transaction. In fact, protection is the principal advantage gained from using an escrow service. *See* Walker & Eshee, *The Safeguards and Dilemmas of Escrows,* 16 Real Est.L.J. 45, 56 (1987); *Blackburn v. McCoy,* 1 Cal. App.2d 648, 654, 37 P.2d 153, 155 (1934); *Escrowee's Duty,* 22 Ariz.L.Rev. at 1149. That objective is insured by the fiduciary responsibility owed by the agent to the principal. Consistent with this fiduciary responsibility, the escrow agent has a duty to strictly follow the terms of the escrow agreement to give effect to the parties' intent. *Tucson Title Ins. Co. v. D'Ascoli,* 94 Ariz. 230, 234, 383 P.2d 119, 121 (1963); *Spaziani v. Millar,* 215 Cal.App.2d 667, 683, 30 Cal.Rptr. 658, 666 (1963).

The escrow agreement may include any conditions or documents that the buyer or seller agrees to incorporate. *Kammert Bros. Enters., Inc. v. Tanque Verde Plaza Co.,* 102 Ariz. 301, 428 P.2d 678 (1967); *King v. Stanley,* 32 Cal.2d 584, 588–89, 197 P.2d 321, 324 (1948). Normally, an escrow agreement includes specific instruments required in a loan closing and a carefully drawn list of instructions defining the escrow agent's duties. Walker & Eshee, *supra,* 16 Real Est.L.J. at 48. No particular form or wording is necessary; rather, the intention of the parties and the purposes contained within the documents control. *Id.* at 50. In the case before us, various documents were included in the escrow agreement. In addition to the escrow in-

---

**3.** *See also Kirby v. Palos Verdes Escrow Co.,* 183 Cal.App.3d 57, 227 Cal.Rptr. 785 (1986); *Han-* *non v. Western Title Ins. Co.,* 211 Cal.App.3d 1122, 260 Cal.Rptr. 21, 24 (1989).

structions, there was a written subordination agreement, a letter of intent, and financial statements.

### 1. Subordination to a "construction" loan

■ Ticor argues that it was not required to subordinate Burkons' lien only to a "construction loan" because neither the escrow instructions nor the subordination agreement indicated that the parties so intended. We disagree. By subordinating Burkons' lien to something other than a construction loan, Ticor breached its contract with Burkons, as well as its fiduciary duty to strictly comply with the escrow instructions.

The subordination agreement cannot be understood without reference to the letter of intent which was specifically incorporated therein, and which shows the use to which the property was to have been put. It also shows the dollar amount of the subordination. "In determining whether ... a valid subordination ... did ... occur, we can look solely to the various written agreements which bear upon this matter." *Drobnick v. Western Fed. Sav. & Loan Ass'n,* 479 P.2d 393, 395 (Colo.Ct.App.1970). We hold that when these documents are read together, no trier of fact could reach any other reasonable interpretation than that Burkons signed the subordination agreement because he believed that Pyramid intended to construct improvements on the purchased land with loan proceeds obtained from Tower.

It is generally understood by members of the real estate profession that the usual purpose of a subordination agreement is to facilitate construction:

> Subordination arrangements are in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the "know how" and the purchaser's lending agency the capital, for the mutually beneficial purpose of developing the land and disposing of it ..., to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill. Because of their nature, "the law

is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement...." (*Irvine v. California Cotton Credit Corp.* (1937) 18 Cal. App.2d 761, 763, 64 P.2d 782. While it may not be impossible that a vendor has agreed to subordinate his purchase money lien to a lien secured by the purchaser to be used for purposes entirely apart from the mutual enterprise, *such an arrangement would be so unusual and so unlikely that we would require it to be spelled out with particularity.*

*Miller v. Citizens Sav. & Loan Ass'n,* 248 Cal.App.2d 655, 662–63, 56 Cal.Rptr. 844, 850–51 (1967) (emphasis added) (footnote omitted); *see* Miller, Starr, & Regalia, *Subordination Agreements in California,* 13 UCLA L.Rev. 1298–99 (1966); Korngold, *Construction Loan Advances and the Subordinated Purchase Money Mortgagee: An Appraisal, a Suggested Approach, and the ULTA Perspective,* 50 Fordham L.Rev. 313 (1981); Lambe, *Enforceability of Subordination Agreement,* 19 Real Prop., Prob. & Tr. L.J., No. 2, 631 (Summer 1984).

This interpretation of the intent of the parties is supported by the testimony of key players in the transaction. The buyer's real estate agent, George Stika, the seller's real estate agent, Barbara Purcell Lingol, Yancy's supervisor and former Ticor branch manager, Albert Pieri, and Joyce Yancy in unsworn testimony (taken by the buyer's investigator in April 1985), all stated that they believed the purpose of the subordination agreement was to permit construction.

Neither the subordination agreement nor the letter of intent, nor any instruction from Burkons indicated that the money Pyramid obtained from Tower was to be used for anything other than construction. Because the usual purpose of subordination agreements is to facilitate construction on the purchased property, in the absence of anything instructing otherwise, Pyramid's use of the Tower proceeds for a down payment was misuse of the money and a

violation of the terms of the subordination agreement and letter of intent. *See Schneider v. Ampliflo Corp.*, 148 Cal. App.3d 637, 639–40, 196 Cal.Rptr. 172, 174 (1983); *Miller*, 248 Cal.App.2d at 663, 56 Cal.Rptr. at 851. Ticor breached its escrow contract and its fiduciary duty to follow the escrow instructions by subordinating Burkons' lien to other than a construction loan, when it knew or had reason to know that Pyramid was in breach of the subordination agreement.

### 2. Recording order of the liens

■ Ticor also argues that it was not required to record Burkons' lien in first position because the subordination agreement cancelled the priority language of the escrow instructions.

The escrow instructions indicated that Burkons' lien was to have first lien position. The subordination agreement did not contradict the language of the escrow instructions; it merely indicated that Burkons would "waive the priority" of his lien by subordinating to a lien obtained by Pyramid for construction. Burkons did not agree in the subordination agreement to be recorded in second position. Ticor breached its contract with Burkons by recording his lien in second position because the subordination agreement in no way instructed the escrow agent to disregard the escrow instructions. In so doing, Ticor also breached its fiduciary duty to follow the escrow instructions.

Upon receipt of the construction loan proceeds from Tower, Yancy learned that the funds were to be used for the down payment on the land rather than construction, and that the remaining funds were to be paid over to Mark Masias, a representative of Pyramid.[4] Yancy told Burkons' investigator (McCracken) that it became immediately apparent to her that the funds were those intended for construction pursuant to the subordination agreement.[5] It

was after this receipt of the funds and with knowledge of the misuse of the funds that Yancy recorded the escrow documents, with the Tower lien in first position and Burkons' lien in second position.

We see no ambiguity created by the subordination agreement as to the order of recordation. We find no requirement that a subordination agreement, to be given effect, must be given recording priority over a first lien deed of trust. If any ambiguity existed in the escrow agent's mind as to the order of recordation, however, the agent had a duty to contact the principal and obtain clarification before proceeding. *Gardenhire v. Phoenix Title & Trust Co.*, 11 Ariz.App. 557, 559, 466 P.2d 776, 778 (1970). If such an ambiguity existed, Ticor's failure to obtain clarification was also a breach of its fiduciary duty.

A competent escrow officer (that is, one possessing the necessary skill and knowledge of the general practices and theories of the industry) ought to have understood the logic of the transaction. If Burkons' lien is recorded in first position, the subordination agreement has some meaning. If Burkons' lien is recorded in *second* position, however, the purpose of the subordination is lost, for Burkons is already in a subordinated, second position by virtue of the recording order. The subordination agreement thus becomes superfluous. Lambe, *supra*, 19 ABA Real Prop., Prob. & Tr. L.J. at 640; *See* Miller, Starr & Regalia, *supra*, 13 UCLA L.Rev. at 1301.

Improper recording of the documents also foreclosed remedies otherwise available to Burkons. The subordination agreement was entered into by Burkons and Pyramid in order to allow Pyramid to obtain a construction loan. The subordination agreement essentially protects the lender, with the seller, in effect, assisting the buyer's development by becoming a quasi-joint venturer in the project. The safety of the seller's lien depends on the

---

4. Mark Masias signed the note with Tower Acceptance as President of Pyramid One, Inc.

5. Although, as the dissent points out, Ticor introduced a signed affidavit of Joyce Yancy which may have partially contradicted Yancy's

statements to McCracken, we note that Ticor made no objection to Burkons' use of this evidence during summary judgment proceedings before Judge Kamin.

success of the development, because the property is overencumbered with the construction lien on the property. Miller, Starr & Regalia, *supra*, 13 UCLA L.Rev. at 1299. Expenses outside those contemplated in the subordination agreement therefore jeopardize the seller's lien and violate the subordination agreement. If the recording had been properly executed, the seller had recourse against the lender for failing to properly monitor use of funds. *Id.* at 1313. With proper recordation, the seller could claim abrogation of the subordination agreement and assert the rights of a first priority lien holder. In the instant case, however, this avenue of recourse was closed to Burkons, because, due to a violation of the subordination agreement, his lien remained in second position; he was unable to assert the rights of a first priority lien holder. Burkons had to turn to Ticor who was responsible for improperly placing him in the inferior recording position. *See id.* at 1309.

### TICOR'S BREACH OF FIDUCIARY DUTY FOR FAILURE TO DISCLOSE

▮ We hold that the trial court erred in granting Ticor's motion for summary judgment on Burkons' claim for breach of fiduciary duty for failure to disclose a known fraud. The fiduciary duty to disclose arises because of Ticor's knowledge of the misuse of the Tower loan proceeds coupled with its knowledge of the overencumbrance of the property. The combination of these and similar occurrences in other escrows involving Pyramid gave rise to the elements of fraud and a duty on the part of Ticor to disclose knowledge of the fraud to Burkons. Ticor's failure to disclose the misuse of funds was thus a breach of its fiduciary duty: "We agree that an escrow agent has no duty to look for fraud, but, if knowledge comes to the escrow agent that there is a fraud, there is a duty to disclose such information to the

parties to the escrow." *Berry v. McLeod,* 124 Ariz. 346, 352, 604 P.2d 610, 616 (1979).

In *Berry,* the sellers alleged that the title company was aware that the real estate agents for the sale were involved in a scheme to defraud the seller. McLeod alleged that the title company knew of the scheme by virtue of the title company's involvement in setting up back-to-back escrows[6] for the purchase and resale of McLeod's property. The real estate agents were violating their fiduciary duties to McLeod by purchasing and reselling the property through a dummy corporation without accounting to McLeod for a "secret profit" on the resale.

Neither party in *Berry* alleged that the escrow company had *actual* knowledge of the fraudulent activity, or that the escrow agent was an active participant in the fraudulent activity. Rather, the dispute was whether the escrow agent was *aware* of the fraud or of the indications which would coalesce into fraud, and whether the agent had a duty to supply that knowledge to the seller.

It was this *awareness of fraud* that the Arizona Supreme Court held should have been disclosed. The title company in *Berry* sought to have an "actual knowledge" standard applied to the escrow agent's fiduciary duty to disclose, "actual knowledge" being a situation in which the escrow agent was an active participant in the fraud. The court, however, expressly reserved the actual knowledge standard for liability based on negligence. *Id.* 124 Ariz. at 352, 604 P.2d at 616. Awareness of fraud was held sufficient to invoke a claim of breach of fiduciary duty. *Id.*

The *Berry* court said that although the evidence in support of McLeod's position was in serious dispute, there was sufficient evidence to resist the granting of a directed verdict on the issue of the title company's fiduciary duty to disclose. *Id.* Thus, the court implied that the escrow agent ought to have known or been aware of the fraud-

---

**6.** For a definition of double or back-to-back escrows, see *Escrowee's Duty, supra,* 22 Ariz.L. Rev. at 1147 n. 12.

ulent scheme and ought to have disclosed this information to McLeod.

We interpret *Berry* to mean that the escrow agent's failure to disclose to the principal information about a fraud of which the agent *ought to have been aware* is a breach of the escrow agent's fiduciary duty.

To prove fraud, all nine elements must exist: 1) a representation, 2) its falsity, 3) its materiality, 4) the speaker's knowledge of its falsity or ignorance of its truth, 5) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, 6) the hearer's ignorance of the information's falsity, 7) the hearer's reliance on its truth, 8) the hearer's right to rely thereon, and 9) the hearer's consequent and proximate injury. *Wagner v. Casteel*, 136 Ariz. 29, 31, 663 P.2d 1020, 1022 (App.1983). We need not decide the sufficiency of the evidence of fraud in the present case, however. As was said in *Berry v. McLeod*, we hold there are sufficient questions of fact on the issue of Ticor's knowledge of the existence of fraud to prevent summary judgment on whether Ticor breached its fiduciary duty to disclose a known fraud. Burkons does not have to prove that Ticor had actual knowledge of the fraud. It is a question of fact whether Ticor's knowledge of Pyramid's other transactions, of the intent of the parties (as evidenced by the letter of intent and subordination agreement), and of the misuse of the Tower loan funds by Pyramid provided sufficient evidence of Pyramid's fraud to have created a duty on Ticor's part to notify Burkons of these occurrences.

Courts have imposed on fiduciaries an affirmative duty of good faith and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading their clients. *SEC v. Capital Research Gains Bureau*, 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237, 247–48 (1963). As we said in our analysis of *Berry v. McLeod*, there is no requirement that the escrow agent have *actual knowledge* of fraudulent activities to compel compliance with the agent's fiduciary duty. It is enough that the surrounding circumstances, the materiality of the information, and the client's need to know would lead a fiduciary of reasonable competence to exercise a duty of utmost good faith and full and fair disclosure of all material facts. *See* W. Prosser & W. Keeton, *Prosser & Keeton on Torts*, § 106 at 738–39 n. 42 (5th ed. 1984); Keeton, *Fraud Concealment and Non–Disclosure*, 15 Texas L.Rev. 1, 10 (1936).

Escrow agents have duties toward their clients not unlike those imposed on other professionals:

> [I]f a person … has knowledge, skill, or even intelligence superior to that of the ordinary person, the law will demand of that person conduct consistent with it. . . .
>
> Professional persons in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

W. Prosser & W. Keeton, *supra*, § 32, at 185 (footnotes omitted). An escrow company holds itself out to the public as having superior knowledge and skill in the area of escrowed real estate transactions. Consumers of escrow services have a right to expect that the agents serving them will exercise reasonable care in performing the work and in keeping the consumers informed of "presently ascertainable facts" which detrimentally affect their position. *Arizona Title Ins. & Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 492, 484 P.2d 639, 645 (1971). An escrow company's failure to do so is a breach of fiduciary duty owed to its customer.

## TICOR'S BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Burkons argues that the trial court erred in granting Ticor's motion to dismiss Count IV of the complaint (bad faith breach of the escrow contract) for failure to state a claim. We agree.

In reviewing the granting of a motion to dismiss for failure to state a claim, the truth of the plaintiff's allegations must be assumed, and dismissal can be upheld only if plaintiff would not be entitled to relief under any set of facts susceptible of proof under the claim stated. *Donnelly Const. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 186, 677 P.2d 1292, 1294 (1984); *Mattison v. Johnston*, 152 Ariz. 109, 114, 730 P.2d 286, 291 (1986).

In the present case, the charge of bad faith breach of contract arises from Ticor's failure to restore Burkons' deed of trust to first lien position upon Burkons' request. Burkons alleges that Ticor's refusal to take steps necessary to remedy the lien priority defect and its denial of liability for creating the problem violates the covenant of good faith and fair dealing implied in the escrow contract. Thus the issue before us is whether Ticor had a contractual or implied duty to correct errors made in handling the escrow and whether in refusing to do so Ticor breached the covenant of good faith and fair dealing.

■ There is a covenant of good faith and fair dealing implied by law in every contract. *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986); *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). The essence of the covenant is that neither party will do anything to deny the right of the other party to receive the benefits that flow from the contract. *Rawlings*, 151 Ariz. at 153–54, 726 P.2d at 569–70; *Wagenseller*, 147 Ariz. at 383, 710 P.2d at 1038. The duty not to act in bad faith or to deal unfairly is a part of the contract and, as with any other element of the contract, the remedy for its breach generally is in the contract. In certain circumstances, however, breach of the covenant may provide the basis for a tort claim. *Wagenseller*, 147 Ariz. at 383, 710 P.2d at 1038.

In Arizona, tort recovery for bad faith breach of contract is well established in actions involving insurance contracts. *Rawlings*, 151 Ariz. at 154, 726 P.2d at 570; *Wagenseller*, 147 Ariz. at 385, 710 P.2d at 1040; *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981). The rationale for permitting recovery in insurance cases has been founded largely on the presence of a "special relationship" between the parties to the contract. These "special relationships" are characterized by elements of *public interest, adhesion*, and *fiduciary responsibility*. *Rawlings*, 151 Ariz. at 158–59, 726 P.2d at 574–75 (citing *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 768, 206 Cal.Rptr. 354, 362, 686 P.2d 1158, 1166 (1984)) (emphasis added). This rationale has now been applied to sureties. *Dodge v. Fidelity & Deposit Co.*, 161 Ariz. 344, 778 P.2d 1240 (1989).

The culpable conduct giving rise to tort action in insurance cases is "an intentional act by which the insurer fails to provide the insured with security and protection from calamity which is the object of the relationship." *Rawlings*, 151 Ariz. at 160, 726 P.2d at 576. The intent required is more than mere negligence or inadvertence; an "evil hand" or intent to do the acts, is required. "To be liable for tort damages [the insurer] need only to have intended its act or omission" and known that its position was groundless or failed to have undertaken adequate investigation. *Id.*

Thus, tort action for breach of the covenant of good faith and fair dealing is more often recognized where the contract involves a special relationship and the purpose of obtaining the contract is something more than commercial advantage or profit, such as service, professional expertise, security, peace of mind, protection, or some other intangible. *Id.* at 159, 726 P.2d at 575. Where one party to a special contractual relationship intentionally breaches the covenant of good faith and fair dealing, and where contract damages would only encourage such behavior, tort remedies are permitted. *Id.* at 160, 726 P.2d at 576.

■ In its motion to dismiss, Ticor argued that Burkons' bad faith count failed to state a claim because Ticor had no contractual obligation to restore Burkons' lien to first position. Ticor also argued that the escrow obligations ended with the close of escrow, citing *Financial Assoc. Inc. v. R &*

*R Realty Co.,* 25 Ariz.App. 530, 544 P.2d 1131 (1976). Thus, because the escrow contract contained no provision requiring Ticor to restore the priority of Burkons' lien, and because its contractual obligations had ended, Ticor argued it had no obligation to comply with Burkons' post escrow request. As Ticor stated in its motion, "Put another way, Ticor did not act in the manner of an insurer, a guarantor or a surety who breach their *insurance* contractual obligation, when such obligations are breached, after a loss has occurred. Such is the purpose of title insurance." Ticor also argued in its motion to dismiss that the tort of bad faith does not apply to escrow contracts because an escrow contract is not an adhesion contract, citing the line of insurance contract cases in which a finding of an adhesion contract was elemental to the tort of bad faith.

The trial court based its decision to grant the motion to dismiss primarily on the ground that an escrow contract is not a contract of adhesion. It said,

> There is no separate tort bad faith claim available to the plaintiff based on the defendant's refusal, under its fiduciary escrow responsibilities, to honor plaintiff's request to restore their deed of trust to a first lien position. Unlike insurance contracts, an escrow contract is not a contract of adhesion and the rationale for allowing bad faith claims in insurance cases does not apply.

(Minute Entry #4 dated July 16, 1985, *Manley v. Ticor Title Ins. Co.,* C–540936).

We disagree. We hold that the trial court erred in dismissing for failure to state a claim in plaintiff's Count IV for bad faith breach of the escrow contract. We do so because we find the necessary elements of a tort action for breach of the implied covenant of good faith and fair dealing present in Ticor's refusal to restore Burkons' lien position to conform with the escrow contract. We believe the escrow contract gives rise to a special relationship similar to that found in insurance and surety contracts. For that reason, we apply the tort remedy for bad faith to escrow contracts.

As previously stated, the characteristics of a special contractual relationship are fiduciary responsibility, adhesion, and public interest. *Rawlings,* 151 Ariz. at 158, 726 P.2d at 574. We have already determined that an escrow agent owes a fiduciary responsibility to the principal. *See ante* 1312.

We also find that an escrow contract serves a public interest not unlike that of an insurance or surety contract. Just as an insurance contract provides protection against economic calamity, *Rawlings,* 151 Ariz. at 154, 726 P.2d at 570, so does an escrow contract provide protection or sense of security to the parties that the transaction will be completed as intended and the calamity of a failed transaction will be avoided. Walker & Eshee, *supra,* 16 *Real Est.L.J.* at 56.

The importance of the protection offered by escrow services is underscored by the widespread use of escrow services in the real estate industry. For most people, the buying and selling of real estate is the largest financial transaction in which they will ever participate. The complexities of many real estate transactions could confuse even a sophisticated person; for that reason, the expert services of an escrow agent are obtained.

The importance of escrow services is also demonstrated by the extent of state regulation of the escrow profession. *See* A.R.S. §§ 6–801 to –840, §§ 20–1561 to –1592. These statutes provide for the licensing of escrow agents, regulation of escrow record keeping, deposit of funds, inspection of records, and, in connection with the issuance of title insurance, the regulation of fees and charges for services. The regulation of the industry is an indication of its importance to the public and of the government's interest in preserving the public's trust in the industry. Imposing tort damages on an escrow company which in bad faith improperly processes an escrow will deter such conduct. *See Dodge,* 161 Ariz. at 346, 778 P.2d at 1242.

Finally, we believe that a special relationship exists between Ticor and Burkons because the escrow contract is one of adhe-

sion. The court below dismissed Count IV on the basis of its finding that escrow contracts, unlike insurance contracts, are not contractions of adhesion. We disagree.

The essence of a contract of adhesion is a standardized contract offered to consumers on essentially a "take it or leave it" basis. The form is normally drafted and imposed by a party enjoying superior bargaining strength and offered to a weaker party who has no realistic choice as to the terms. *See* 2 *Words and Phrases*, "Adhesion Contract," at 172–74 (Supp.1989). The escrow contract between Ticor and Burkons is such a contract.

Ticor argues that the contract is not adhesive because Burkons *could* negotiate the terms of the contract. We understand Ticor to be referring to the terms on the first page of the escrow contract. A review of these terms, however, reveals that they are little more than a memorialization or recitation of the terms of the real estate purchase contract between Burkons and Pyramid. The remainder of the first page and all of the second page of the escrow contract is a standardized form prepared by Ticor. The escrow agreement in this case was like the "usual insurance policy" described in *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co*, 682 P.2d 388, 395, 140 Ariz. 383, 390 (1984): "largely adhesive; some terms are bargained for, but most terms consist[ing] of boilerplate, not bargained for, neither read nor understood by the buyer, and often not even fully understood by the selling agent."

Not every standardized form, however, constitutes an adhesion contract. There must also be a showing of disparate bargaining power. *Chandler v. Aero Mayflower Transit Co.*, 374 F.2d 129, 135 n. 11 (4th Cir.1967) ("adhesion contract" is standard, printed form contract offered to the public by an industry so powerful as to be able to effectively impose terms); *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 924 (Minn.1982).

We find in this case that an inequality of bargaining power does exist. Neither Schnitzer nor Burkons was experienced in the real estate business. As a result, they,

like many people, were guided through the transaction by the interlocking functions of the real estate agent, the escrow agent, and the title insurance company (the latter two, representatives of Ticor). Even the very issue of whether to use an escrow service at all, for instance, was not a choice freely made by Burkons, as the real estate purchase contract used by Stika contained a boilerplate section which required the use of an escrow agent and escrow services. The real estate contract also required that the seller provide the buyer with a title insurance policy. The escrow contract contained boilerplate language which provided for the insurance of the title. The formalized system of the real estate sales industry from purchase agreement to escrow contract to title insurance policy leaves little room for bargaining by the buyer or seller other than over price and payment terms. The rest of the transaction is handled by an industry system of preprinted, standardized forms issued by the various businesses which profit from attending the transaction (real estate agencies, escrow, and title insurance companies). Agents of these businesses bring significantly greater knowledge and power to the bargaining table. In fact, they write the contracts. Consumers of these services must assume that the service agents will act in good faith, for the terms of the average real estate service contract (purchase, escrow, or title insurance) are not negotiable.

Therefore, we hold that the escrow contract does fit the description and character of an adhesion contract. It embodies a standardized form drafted by the escrow company, which enjoys a superior bargaining position, and the contract form is imposed on the weaker party, here Burkons, who had no realistic choice as to its terms. We, therefore, hold that the trial court erred in finding that an escrow contract is not a contract of adhesion, and in dismissing on that basis Burkons' Count IV, breach of the covenant of good faith and fair dealing, for failure to state a claim.

We also address Ticor's additional arguments that the escrow contract contained no provision requiring Ticor to restore Bur-

kons' lien to first-recorded position, and that with the close of escrow Ticor owed no further duty to Burkons. These arguments are entirely meritless for the following reasons. An escrow contract embodies a fiduciary obligation imposed on the agent to protect the principal's interest, which is the main reason a consumer obtains escrow services in the first place. Correction of errors committed by the escrow agent is, therefore, entirely consistent with the duty imposed by the contract. There need be no express provision that Ticor correct its own mistakes; the fiduciary duty imposed on Ticor requires that it do so.

Furthermore, in this particular case, Ticor's duty to correct its error is enhanced by the ongoing relationship it enjoyed as a result of the title insurance policy it also sold to Burkons.[7] If, due to Ticor's own error, a defect in title had been discovered after close of escrow, the title insurance would have protected Burkons. Ticor's duty to correct its mistakes made in escrow lasted beyond the close of escrow.

We distinguish *Financial Assocs., Inc. v. R. & R. Realty Co.,* 25 Ariz.App. 530, 544 P.2d 1131 (1976). In *Financial Associates,* the defendant title company was granted summary judgment because of plaintiff's inaction. Plaintiff failed to act in that case until nearly three years after the complained-of error. The court held: "This long delay in bringing suit was prejudicial to all the defendants.... Here we have both a lack of diligence on the part of the appellant and prejudice to the appellees." *Id.* at 531, 544 P.2d at 1132. In the case before us there is no such lack of diligence. Burkons notified Ticor promptly upon discovery of the improper order of recording. When Ticor refused to correct its error, Burkons filed suit, a year and four months after close of escrow. Here the plaintiff acted with due diligence, and to the extent that *Financial Associates* differs with this holding, we overrule it.

## ATTORNEY'S FEES

 Ticor was awarded $35,000 in attorney's fees below pursuant to A.R.S. § 12–341.01, authorizing an award of reasonable attorney's fees to the successful party in a contractual dispute. Because we reverse the judgment of the trial court on substantive matters appealed therefrom, we reverse the award of attorney's fees as well: Ticor is not a successful party. Because we reverse the trial court's grant of summary judgment, plaintiff is the "successful party" on this appeal under A.R.S. § 12–341.01(A). *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 393–94, 710 P.2d 1025, 1048–49 (1985) (Supplemental Opinion); *Dodge v. Fidelity & Deposit Co.,* 161 Ariz. 344, 348, 778 P.2d 1240, 1244 (1989). Accordingly, we grant plaintiff's request for attorney's fees under A.R.S. § 12–341.01(A), in an amount to be determined upon compliance with rule 21(c), Arizona Rules of Civil Appellate Procedure.

Plaintiff is entitled to attorney's fees arising from his appeal of the trial court's ruling on all four counts. Although recovery under A.R.S. § 12–341.01 is limited to actions "arising out of the contract," while Count IV requests recovery in *tort* for bad faith breach of contract, our supreme court has held that breach of the implied covenant of good faith is a cause of action which would not exist "but for" the breach of contract. Thus, recovery of attorney's fees pursuant to A.R.S. § 12–341.01 is permissible. *Barmat v. John & Jane Doe Partners A–D,* 155 Ariz. 519, 522, 747 P.2d 1218, 1221 (1987); *see Dodge,* 161 Ariz. at 348, 778 P.2d at 1244. As we have already pointed out, in Arizona, in the absence of a contract, an escrow agent owes no fiduciary duty. Consequently, Counts I, II, and III also arise "out of the contract," and recovery of attorney's fees is proper with respect to these counts as well.

---

7. We distinguish, for purposes of this opinion, *United States v. Title Ins. Rating Bureau, Inc.,* 700 F.2d 1247, 1249 (9th Cir.1983), *cert. denied,* 467 U.S. 1240, 104 S.Ct. 3509, 82 L.Ed.2d 819 (1984), which held for purposes of the McCarran Act exemption from taxation, that performance of escrow services is not the "business of insurance." The holding is narrowly construed to apply only to those questions arising in a federal antitrust context. We do not believe that our holding contradicts the Ninth Circuit holding.

## CONCLUSION

We hold that the trial court erred in granting summary judgment to Ticor on Count I (breach of contract), Count II (breach of fiduciary duty for failure to follow escrow instructions), and Count III (breach of fiduciary duty for failure to disclose known fraud). We also reverse the trial court's order granting Ticor's motion to dismiss Count IV (bad faith breach of contract) for failure to state a claim. We reach no opinion on Count V, emotional and mental distress, as it was not argued in appellant's brief. We remand this case to the trial court for further proceedings consistent with this opinion.

SHELLEY, P.J., concurs.

BROOKS, Judge, dissenting,

I respectfully dissent on all issues addressed by the majority and would therefore affirm the judgment of the trial court.

## THE ALLEGED BREACH OF THE ESCROW CONTRACT

The crux of the majority opinion is that the documents submitted to Ticor showed Burkons' intent to subordinate his deed of trust *only* to a construction loan. I disagree.

The first document executed by the parties was the real estate purchase contract. This contract is a form agreement and contains the following pertinent handwritten language: "Escrow to contain subordination agreement drawn up by buyer's attorney on a form acceptable to Title Co. Escrow to contain letter of intent as to amounts and use, (financials attached)...." This indicates that the parties were going to execute a subordination agreement prepared by the buyers' attorney; the title company was to approve the form, or at least find it acceptable, and the escrow was to contain a letter of intent as to amounts and use. A supplement to the real estate purchase contract states: "The buyer may not place another lien of any type against this property without written permission from the seller." The purchase contract makes no reference to condition-ing subordination to a deed of trust securing a construction loan.

The escrow instructions do not differ materially from the purchase agreement. They are provided on a standard Ticor form, and spaces are typed in indicating that payment to the seller will be in the form of a $1,000 earnest money payment, $24,000 cash at the close of escrow and a $110,000 note and first deed of trust. Other typed provisions reiterate statements in the purchase contract concerning the requirement that the seller must accept the subordination agreement and letter of intent in writing. There is no reference to a construction loan.

The next significant document is the subordination agreement. It is a form document *not* prepared by Ticor which contains language at the top of the first page stating "See attached letter of intent made part of this subordination agreement." The body of the subordination agreement refers to a $67,000 loan but makes no reference whatsoever to the use of the loan.

The document upon which the majority relies for its conclusion that the subordination agreement was intended to be for a construction loan was the letter of intent appended to the subordination agreement. That letter reads:

> Rev. Domenico Spano and Dr. Dennis B. Noss formed a joint venture to construct a medical complex on the project mentioned. We, therefore, intend to start construction as soon as approval is met.
>
> We have contracted for the property to be carefully masterplanned by Frank Clemente and Associates (955–0740), of Phoenix, Arizona, and hope our site plan is ready by December 1, 1983.
>
> Because of our building methods, subordination will be minimal, approximately 50% of selling price.

The letter was signed by Schnitzer, on behalf of Burkons, as having been accepted and approved.

The issue is whether this letter should have put Ticor on notice that the parties intended to subordinate only to a construction loan. If so, Ticor's later knowledge

that Pyramid I was using the loan as the source of its down payment raises factual issues concerning Ticor's duty to disclose this information to Schnitzer and to seek clarification before closing escrow.

However, the letter of intent does not address how the loan proceeds are to be used. It simply states that subordination will be approximately 50% of the selling price which is consistent with a $67,000 loan in relation to a $135,000 selling price. Although the letter discusses the buyers' intent to construct a medical complex, it does not indicate the source of funds for construction or state that the $67,000 loan is to be used for construction. Further, it is hardly reasonable to assume that a $67,000 loan would suffice to construct a medical complex.

While the letter is incomplete in the sense that it did not state how Spano and Noss intended to use the loan proceeds, *the parties did not make this information significant to Ticor for purposes of closing the escrow.* The escrow instructions simply directed Ticor to close the escrow upon receiving the monies and the documents described in those instructions. The instructions called for a subordination agreement and a letter of intent that had been signed and accepted by the seller. This is precisely what Ticor received. Neither the instructions themselves, nor other duties imposed by law, require an escrow officer to question the wisdom or legal consequences of those documents. *Shaheen v. American Title Ins. Co.,* 120 Ariz. 505, 586 P.2d 1317 (App.1978). *See also Woodworth v. Redwood Empire Savings & Loan Ass'n,* 22 Cal.App.3d 347, 99 Cal. Rptr. 373 (1971). The only condition placed on the subordination by the letter of intent was a limit of $67,000 on the amount to which the Burkons deed of trust would be subordinated. The result was an unconditional subordination of Burkons deed of trust to a $67,000 first deed of trust.

The majority states that Yancy admitted in an interview with Burkons' investigator that she knew that the purpose of the subordination was to make construction on the property possible and that the funds that were supposed to be used to finance construction were instead being used to make the down payment on the property. However, in response to that same allegation in the trial court, Ticor produced an affidavit in which Yancy swore that no one informed her while the escrow was pending that the Burkons deed of trust should only be subordinated to a construction loan. Yancy further stated under oath that she had no knowledge of an agreement between Burkons and Pyramid I that the loan proceeds were to be used to improve the property.

Burkons did not produce an affidavit that controverted Yancy's sworn statements. The allegations that he made based upon Yancy's unsworn statements in an interview with a third party did not constitute facts that the trial court could consider in ruling on Ticor's motion for summary judgment. *Prairie State Bank v. Internal Revenue Service,* 155 Ariz. 219, 745 P.2d 966 (App.1987). We therefore cannot consider the alleged statements on appeal. *See id.*

The majority also states that Yancy's supervisor, Albert Pieri, admitted that he believed that the purpose of the subordination agreement was to *make construction possible.* I disagree.

First, it is important to note that Pieri was not involved in the Burkons escrow. However, during Pieri's deposition, Burkons' counsel asked him to read and interpret some of the escrow documents. He was then asked what the letter of intent told him about the nature of the loan to which the sellers were going to subordinate. This exchange followed:

A. It says that they're going to construct a complex, a medical complex.

Q. So you are telling me that that letter of intent tells you that the sellers are going to subordinate to a construction loan?

A. It says they intend to start construction as soon as approval is met.

Q. "Construct" is the key word; is that correct?

A. If you say so.

Q. No, sir, I'm asking you what that says to you.

A. I don't know that it is. I don't know. I didn't handle the transaction, sir.

This testimony does not constitute an acknowledgement on Pieri's part that the purpose of the subordination agreement was to make construction possible.

### ORDER OF RECORDING

The majority also concludes, however, that Ticor breached the escrow contract by recording the deeds of trust in the wrong order. The majority states that Ticor should have recorded the Burkons deed of trust *before* the Jacobson deed, because the escrow instructions stated that Burkons was to receive a first lien. The Jacobson deed of trust would then have gained priority *only* by reason of the subordination agreement rather than by the order of recording. Had Ticor recorded "in the correct order," the reasoning continues, Burkons could have attacked the subordination agreement and preserved his first lien position.

I disagree, because this analysis again assumes that subordination was conditioned on the new loan being a construction loan. As previously discussed, the subordination agreement unconditionally put the Burkons deed of trust in *second* position to the Jacobson deed of trust. Further, the escrow instructions do not tell Ticor how to effectuate that second position nor do they refer to a particular recording order. They do not even specify which instruments to record. However, boilerplate printed language in the escrow instructions authorizes Ticor to record whatever instruments are necessary to carry out the instructions.

Ticor could have effectuated Burkons' second position simply by the recording order, i.e., recording the Jacobson deed of trust prior to the Burkons deed of trust. However, Ticor carried out its instructions to place Burkons' lien in a second lien position by recording the Burkons deed of trust after the Jacobson deed of trust and also by recording the subordination agreement. Whether Ticor put the Burkons deed of trust in second position by the recording order of the deeds, by recording the subordination agreement or both, the bottom line is that the agreement to subordinate, not the recording order, created Burkons' subordinate lien position. Where a party agrees to subordinate its lien or waives its right to priority, the order of recording becomes irrelevant. *Colonial Villas, Inc. v. Title Insurance Co. of Minnesota*, 145 Ariz. 590, 703 P.2d 534 (App.1985). *See also Middlebrook–Anderson Co. v. Southwest Savings & Loan Assoc.*, 18 Cal. App.3d 1023, 1034, 96 Cal.Rptr. 338, 344 (1971).

The cases relied upon by Burkons to support his contention that Ticor recorded in the wrong order involve situations in which there were express agreements to subordinate *only* to construction loans, a fact notably absent from the documents in this case. *See Middlebrook–Anderson Co.*, 18 Cal.App.3d at 1031, 96 Cal.Rptr. at 342. *Ruth v. Lytton Savings & Loan Assoc.*, 266 Cal.App.2d 831, 72 Cal.Rptr. 521 (1968), modified on other grounds, 272 Cal. App.2d 24, 76 Cal.Rptr. 926 (1969); *Spaziani v. Millar*, 215 Cal.App.2d 667, 30 Cal. Rptr. 658 (1963).

### COMPLETION AND RECORDATION OF THE SUBORDINATION AGREEMENT

In an argument not addressed by the majority, Burkons contends that Ticor was without authority to fill in the blanks on the subordination agreement and record it without further instruction from the parties. I disagree.

It should first be noted that Burkons does not contend that Ticor filled in the information incorrectly. The accuracy of that information is directly confirmed by the buyers' note and the Jacobson deed of trust. Burkons simply complains that Ticor wasn't authorized to fill in the blanks and that had it not done so, the agreement would have been incomplete and thus nonbinding.

Where a person signs a form instrument that contains blank spaces, he implicitly authorizes the holder to fill in the blanks in

accordance with the underlying agreement. *Hutcheson v. Herron,* 131 Ill.App.2d 409, 413, 266 N.E.2d 449, 452 (1970). *See also Poland v. Gibson,* 190 Neb. 696, 699, 211 N.W.2d 900, 902 (1973). According to Stika's uncontroverted testimony, Schnitzer authorized Stika to have the blanks completed according to the deed of trust and loan obtained by the buyers. Stika, in turn, authorized Ticor to fill in the blanks by delivering the signed agreement and directing that it be completed in compliance with the later delivered note and deed of trust.

An agent who possesses the authority to conduct a transaction has the implied authority from his principal to do what is necessary to carry it out. *Carrel v. Lux,* 101 Ariz. 430, 440, 420 P.2d 564, 574 (1966). A principal who gives his agent a document containing blanks vests the agent with the authority to fill in those blanks in accordance with the principal's intentions. *Hutcheson,* 131 Ill.App.2d at 413, 266 N.E.2d at 452; *First National Bank of Jackson v. IDS Mortgage Corp.,* 353 So.2d 775, 778 (Miss.1978); *Poland,* 190 Neb. at 699, 211 N.W.2d at 902.

While acknowledging that Ticor had authority to fill in the blanks according to the parties' intent, Burkons nevertheless argues that Ticor was aware of the buyers' intent but not of *his* intent. He claims that Ticor should have contacted him or Schnitzer prior to filling in the blanks. However, by signing the agreement and having it notarized, Schnitzer had already communicated his intent to approve a subordination to a $67,000 loan and deed of trust without regard to the identity of the lenders, the interest rate which the buyers would have to pay or other terms of that loan. There is no evidence of a contrary intent in any documents transmitted to Ticor; and there is no evidence that Schnitzer objected to the filled in spaces when escrow closed. To the contrary, Stika testified that after signing the subordination agreement, Schnitzer complained only about the delay in closing. Further, when Burkons initially received copies of the subordination agreement and other documents from Ticor, he expressed no objection to Ticor's authority to fill in the blanks. It was not until more than a year after closing that Burkons raised an objection to Ticor's authority.

I would hold that Ticor did not breach its escrow agreement by filling in the blank spaces of a subordination agreement signed by both parties and delivered to it with instructions from the buyers' agent to complete it in accordance with loan documents to be delivered prior to the close of escrow.

## ALLEGED BREACH OF FIDUCIARY DUTIES

An escrow relationship gives rise to two distinct fiduciary duties by an escrow agent. The escrow agent must act in strict accordance with the terms of the escrow agreement and has a duty to disclose a known fraud. *Berry v. McLeod,* 124 Ariz. 346, 604 P.2d 610 (1979). *See also Maganas v. Northroup,* 135 Ariz. 573, 576, 663 P.2d 565, 568 (1983).

As previously discussed, I would find that Ticor fully complied with its fiduciary duties to follow its escrow instructions. The issue remaining is whether there is evidence from which a trier of fact could conclude that Ticor breached its fiduciary duty by failing to disclose knowledge of Pyramid I's alleged fraud.

Burkons contends, and the majority agrees, that the following information possessed by Ticor is equivalent to knowledge of fraud: (1) Ticor knew that Burkons had agreed to subordinate his deed of trust only to a construction loan deed of trust; (2) Ticor learned that the loan was not a construction loan and that the buyers intended to fund their down payment from its proceeds; (3) Ticor knew that the property would be overencumbered; and (4) Ticor had handled previous escrows involving the same buyer and the same scheme. Again, I disagree.

Ticor's knowledge that the buyers intended to fund their down payment with part of the loan proceeds is significant to the fraud issue *only* if Ticor knew that Burkons believed he was subordinating to a construction loan deed of trust. Neither

Burkons nor Schnitzer instructed Ticor that the loan proceeds could not fund the down payment.

Burkons' contention that Ticor knew that the property was overencumbered ignores the fact that Schnitzer too could have discerned that fact by looking at the purchase contract and subordination agreement. It is obvious that the total amount of the liens placed against the property exceeded the sales price. Thus, Ticor had no information to disclose relating to overencumbrances that was not readily apparent to the seller.

The majority places considerable emphasis on the fact that Ticor had an internal written policy describing frauds which can occur during real estate transactions where property is overencumbered. However, Ticor's knowledge that some overencumbered property transactions can be vehicles of fraud is not evidence that Ticor knew that the Burkons transaction was fraudulent.

*Berry v. McLeod* holds that actual knowledge of a fraud triggers an escrow agent's duty of disclosure. 124 Ariz. at 352, 604 P.2d at 616. A suspicion of fraud is insufficient to mandate disclosure. *Id.* There is simply no evidence in the record that Yancy had knowledge that a fraud was being perpetrated. At the time she was handling the Burkons escrow, other escrows which she handled involving Pyramid I had not resulted in problems. There is no evidence whatsoever that she knew that the buyers did not intend to fulfill their payment obligations. An escrow officer does not have a duty to search for fraud. *Id.* The parties to an escrow contract do not pay her to be an investigator or attorney. In any event, the only information which Yancy had a duty to disclose was already disclosed to the seller in the escrow documents—the seller had agreed to an unconditional subordination of his purchase money deed of trust to a second deed of trust on overencumbered property.

## BAD–FAITH BREACH OF ESCROW CONTRACT

Since Ticor did not breach its escrow contract, it follows that Ticor could not be liable for a "bad faith" breach. However, I would hold that Burkons' claim is not recognized as a matter of law.

Every contract contains an implied covenant of good faith and fair dealing. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). Arizona courts have recognized tort recovery for breach of an implied covenant of good faith and fair dealing in cases involving insurance and employment contracts. *See Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986) (insurance contracts); *Wagenseller*, 147 Ariz. 370, 710 P.2d 1025 (employment contract); *Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *Noble v. National American Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981).

As stated in *Rawlings*, although tort recovery for breach of an implied covenant is well established for insurance contracts, it is only reluctantly extended to other relationships. 151 Ariz. at 158, 726 P.2d at 574.

In *Rawlings*, our supreme court indicated that tort recovery may be appropriate where the type of contract involved is one in which the plaintiffs seek certain intangible benefits, rather than commercial advantage or profit, and where the parties' relationships "are characterized by elements of public interest, adhesion and fiduciary responsibility." *Id.* Historically, such relationships have been held to include duties of common carriers to carry passengers or goods safely, relationships between innkeeper and guests, physician and patient, and attorney and client. *Id.* at 159, 726 P.2d at 575.

To the contrary, the escrow contract involved in this litigation was a vehicle for Burkons to obtain economic gain when the deal closed. Further, escrow agents are retained to close a deal pursuant only to the parties' agreed-upon instructions. Finally, escrow contracts involve individualized and customized terms instead of the "contract of adhesion" provisions often part of an insurance contract. The parties, not the escrow agent, create the contract

318

terms. Escrow companies simply memorialize these agreements. The escrow instructions delineating the parties' deal is expressly approved by the parties to the contract. If a party disagrees with a proposed term, he can change it or reject it.

I would find that the trial court correctly determined that Burkons' tort claim arising out of breach of an escrow contract did not state a cause of action.

CONCLUSION

For all of the foregoing reasons, I would affirm the judgment of the trial court.