402 P.2d 423

**GOODYEAR AIRCRAFT CORPORATION,**
Appellee and Cross-Appellant,

v.

**ARIZONA STATE TAX COMMISSION,** a
*body corporate and politic, and Thad M.*
*Moore, Warren Peterson, and William E.*
*Stanford, as members of and constituting*
*said Arizona Tax Commission,* Appellants
and Cross-Appellees.*

**No. I CA–CIV 37.**

Court of Appeals of Arizona.

May 26, 1965.

---

* This appeal was filed with the Arizona
Supreme Court and assigned that Court's
number 7656. This matter was referred
to this Court pursuant to Section 12–
120.23, A.R.S.

Snell & Wilmer, by Edward Jacobson; Phoenix, for appellee and cross-appellant.

Robert W. Pickrell, Former Atty. Gen., Darrell F. Smith, Atty. Gen., by Philip M. Haggerty, Asst. Atty. Gen., for appellants and cross-appellees.

DONOFRIO, Judge.

This is an appeal by the Arizona State Tax Commission (hereafter called the commission) and a cross appeal by the Goodyear Aircraft Corporation, a Delaware Corporation, (hereafter called plaintiff) from a judgment awarding the plaintiff the sum of $47,032.28 of the taxes which has been paid under protest and awarding the commission the sum of $11,095.58 out of the taxes paid under protest.

■ The cause was submitted to the trial court on stipulated facts, a deposition of a Deputy General Counsel of the United States Air Force and exhibits containing the contracts upon which the action was predicated. Since it turns upon the interpretation to be applied to undisputed facts this court is free to substitute its analysis of the record for the analysis of the trial court. Combustion Engineering v. Arizona State Tax Commission, 91 Ariz. 253, 371 P.2d 879 (1962).

The action concerns the validity of a $58,203.53 tax assessment by the commission upon sales made by the plaintiff during the period March 1, 1955, to November 30, 1957.

The basic issue is the validity of the imposition of transaction privilege taxes upon plaintiff under A.R.S. § 42–1301 et seq. The plaintiff timely objected to the assessment and after denial by the Commission paid the taxes under protest and brought this action pursuant to A.R.S. § 42–1339, subsec. B for recovery of the taxes.

The action turns on the determination of the taxability of certain acts or transactions of the plaintiff taxpayer. These can be divided and designated into the following three areas: (a) the dirigible envelope sales, (b) the destruction test sales and (c) the special tooling sales.

We shall treat each activity or transaction in the order we have designated them.

■ First is the dirigible envelope sales. This activity consisted of fabricating and selling (before July 1, 1956, date after which sales to Federal Government are exempted under A.R.S. § 42–1321, subsec. B, par. 1.)[1] certain dirigible envelopes as spare parts to the United States Department of Navy. The tax assessment thereon amounted to $24,840.69. The question presented is whether the sales were made within the State of Arizona, and therefore taxable under A.R.S. § 42–1309 [2] and § 42–1301, subsec. 14,[3] or whether the sales were made either outside the State of Arizona or in interstate commerce. In either of these latter events the plaintiff would not be subject to the tax. The trial court found these sales were not sales within this state.

The envelopes are large gas bags which, when inflated with helium and attached to power and control gondolas form a complete operating dirigible. When deflated they form a small parcel about the size of an office desk. The envelopes contain no moving parts.

They were purchased by the Navy as spare parts and as a part of a larger contract. The Navy placed, and the plaintiff accepted the order at plaintiff's home office in Akron, Ohio. The fabric for the envelopes was supplied from Akron, Ohio. The envelopes were manufactured from this fabric in Litchfield Park, Arizona. They were partially tested and inspected by the Navy at Litchfield Park, and there transferred f. o. b. private carrier for transportation to Lakehurst, New Jersey. After arrival in Lakehurst they were subjected to final testing. Usually, after testing (unless same was delayed), payment was made to Akron, Ohio. By terms of the contract, final acceptance occurred only upon final testing and payment at Lakehurst.

Plaintiff contends that the sales of the envelopes were made either outside the State of Arizona or in interstate commerce. On the other hand, the Commission contends the transaction was an Arizona transaction, and that the tax is not a burden on interstate commerce in violation of the In-

1. "§ 42–1321. Deductions. * * * B. After June 30, 1956, the provisions of this article shall not apply to sales made directly:
    "1. To the United States government, its departments or agencies by a manufacturer, modifier, assembler or repairer."

2. "§ 42–1309 A. There is levied and there shall be collected by the commission for the purpose of raising public money to be used in liquidating the outstanding obligations of the state and county governments, to aid in defraying the necessary and ordinary expenses of the state and the counties, to reduce or eliminate the annual tax levy on property for state and county purposes and to reduce the levy on property for public school educa-

tion, annual privilege taxes measured by the amount or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the schedule as set forth in §§ 42–1310 through 42–1315."

3. "§ 42–1301, subsec. 14. 'Sale at retail' means a sale for any purpose other than for resale in the form of tangible personal property, but 'transfer of possession', 'lease' and 'rental' as used in the definition of 'sale' means only such transactions as are found upon investigation to be in lieu of sales as defined without the words 'lease or rental'."

terstate Commerce clause of the United States Constitution.

Before studying the application of the many commerce clause decisions to the instant case, we believe it appropriate to study first the question as to whether the sale was an out-of-state sale. Should our conclusions be the same as the trial court we need not go further.

Sale is defined (by the then existing statute A.R.S. § 42–1301, subsec. 11) as follows:

> " 'Sale' means any transfer of title or possession, or both, * * * in any manner or by any means whatever, of tangible personal property, for a consideration * * *."

The commission argues, among other things, that the order was filled in Arizona and title passed to the Government when the envelopes were placed on the private carrier f. o. b. Litchfield Park, Arizona. We agree these are facts to be considered, but not controlling in and of themselves. First, we must look to the provisions of the contract to determine the intention of the parties and then to the facts regarding the transaction to ascertain where title transferred, and, therefore, the place of sale.

The terms of the contract and the facts establish that final inspection (being a total inflation test for constant pressure) took place at Lakehurst, New Jersey. They further spell out that the items will be finally accepted upon final inspection by the government.[4] And further, the contract spells out that delivery shall be considered to have occurred when the items are turned over to the government at the delivery point specified after final acceptance.[5]

As to payment the contract provides that final payments were to be made upon the submission of properly certified invoices and " * * * upon delivery and final acceptance thereof." The facts show that payments were sometimes made prior to the inspection, but we cannot see where the payment in some instances before inspection, after the envelopes reached Lakehurst, New Jersey, alters the situation.

Final inspection, final acceptance, delivery and payment all took place in Lakehurst, New Jersey. We consider these factors controlling and, therefore, transfer of title occurred in Lakehurst, New Jersey. We do not believe that the point of physical delivery to the carrier f. o. b. Litchfield Park, Arizona, was intended by the parties to be, or is, the point where title transferred and therefore the place of sale under these circumstances. The intention of the parties, as reflected by the contract provisions, was that the sale (transfer of title) would take place in Lakehurst, New Jersey, after final inspection, acceptance and delivery.

Ordinarily, a buyer is not obligated to pay for an item until a sale is consummated. We can assume the government by the terms mentioned has seen fit to protect itself against the possibility of defective merchandise by providing that a sale is not consummated until there is a final inspection of the item. This is easy to understand when we consider the envelope is a large costly item which when inflated becomes a dirigible. A defective bag permitting the escape of gas would render the item practically worthless.

We hold that title transferred in New Jersey and therefore, within the meaning of the above statute defining sale, that the sale occurred in New Jersey. Since the sale did not occur in the State of Arizona, the transaction is not subject to the Arizona

---

4. Contract 64, printed page 11, last sentence of Section H(1) (IV) provides: "All other supplies (envelopes included herein) to be furnished by the contractor under this contract will be finally accepted upon tender thereof by the contractor and final inspection by the Government." (Explanatory insert supplied)

5. Contract 64, printed page 2, Section B, second sentence, provides: "Delivery of other items (envelopes included herein) shall be construed to occur when such items are turned over to the Government at the delivery point specified after final acceptance thereof by Bureau of Aeronautics representative." (Explanatory insert supplied)

tax for the reason that A.R.S. § 42–1312, subsec. A imposes a tax only upon those "* * * engaging or continuing *within this state* in the business of selling any tangible personal property whatever at retail * * *". (Emphasis supplied.) We agree with the trial court in this respect.

We next consider the transaction designated as destruction test sales. This activity consisted of performing certain destruction tests in order to develop engineering information for the purchaser (Manufacturer) at his request. In short, airplane subassemblies were deliberately subjected to sufficient stress and strain to learn at what point they would be destroyed. After testing, the subassemblies were, but for rare instances, useable only as scrap. The tax assessment on this activity was $589.44.

The issue is whether this constituted a sale of tangible personal property taxable under A.R.S. § 42–1309 [6] and § 42–1301, subsec. 14 [7] or, instead, whether it constituted a sale of engineering services in which tangible personal property was only an inconsequential element and, therefore, tax exempt pursuant to A.R.S. § 42–1312, subsec. A, par. 2, hereafter set out. On this issue the court found for the plaintiff.

Plaintiff billed the manufacturer for both the engineering services involved, the reports of the tests, and the actual cash value of the items destroyed. The tests all took place at the Litchfield Park Plant. These events occurred prior to July 1, 1956.

The commission takes the position that the tangible personal property destroyed was sold at retail while Goodyear takes the position that the sale was basically a sale of information to which the property portion is incidental and therefore not taxable under A.R.S. § 42–1312, subsec. A, par. 2, which reads in part:

" * * * the tax shall not apply to the gross proceeds of sales or gross income from:

"2. Professional or personal service occupations, or businesses which

involve sales or transfers of tangible personal property only as inconsequential elements thereof."

The trial court in finding for the plaintiff on this issue did not set forth any precise findings of fact. The basic question to be resolved of sales versus services is one that has been frequently litigated. When is the transfer of tangible personal property in conjunction with the performance of services considered inconsequential or incidental to the services and when is it of sufficient consequence to be taxable either separately or upon the gross charge?

Counsel for plaintiff has referred in his brief to a case setting forth the following possibilities regarding mixed sales of services and property:

1. The service is the main item sold and the property sold is incidental thereto and not separately charged. (not a taxable sale as a sale of services.)

2. The services and property sold can be readily separated. (one tax exempt and the other taxable.)

3. The service sold is incidental to the property and not separately charged. (taxable in gross).

This court believes that this fairly represents the possibilities which may exist in mixed sales of services and tangible personal property. The category into which a vendor falls is a question of fact to be determined in light of all the evidence presented in a given situation.

When there is a fixed and ascertainable relationship between the value of the article and the value of the service rendered in connection therewith so that both may be separately stated, then the vendor is engaged in both selling at retail and furnishing services and is subject to the tax as to one and tax exempt as to the other. Where the property and the services are distinct and each is a consequential element capable of ready separation, it cannot be said one is an inconsequential element within the exemption provided by

---

6. Note 2, Supra.

7. Note 3, Supra.

the statute. See Rice v. Evatt, 144 Ohio St. 483, 59 N.E.2d 927, 157 A.L.R. 572 (1945).

In the instant case the records reflect that the value of the subassemblies destroyed was separated from the charge for engineering services for accounting purposes. The value of the subassemblies destroyed was $29,471.75. The value of the engineering services in the destruction tests was $3,214.-50. The Tax Commission assessed a tax of $589.44 on the value of the subassemblies ($29,471.75) only. Contract No. 12, a part of exhibit A submitted for the consideration of the court clearly separates these items. Further, the purchaser could readily procure the subassemblies from the plaintiff and then have them tested by another organization, particularly so since the purchaser provided the test specifications.

Since the services herein can be readily separated from the tangible personal property and the property is not an inconsequential element of the services, the court reverses the trial court on the issue of the tax on "destruction tests" and finds for the commission in the amount of $589.44.

The third and last transaction to be considered has been designated by the lower court as special tooling sales. This activity consisted of designing, fabricating and selling many items of special tooling, pursuant to purchase orders issued to the plaintiff by prime contractors, or subcontractors under prime contractors of the United States Government. The assessment on this activity was $32,717.63.

The plaintiff's contention is that the vast majority of the contracts involved were sales for resale, ultimately to the United States Government, and therefore were not taxable under A.R.S. § 42–1309 and § 42–1301, subsec. 14. In the alternative, the plaintiff contends that a majority of the sales were tax exempt under A.R.S. § 42–1321, subsec. B, par. 1, as being sales made directly to the United States Government after June 30, 1956.

On the other hand, the commission contends that the sales were made directly to a prime or subcontractor as a final consumer with security title only resting in the United States Government, and, therefore, were taxable pursuant to A.R.S. § 42–1309 and § 42–1301, subsec. 14. In the alternative, the commission contended that many of the sales were made directly to the United States Government prior to July 1, 1956, being prior to the enactment of the exemption for sales to the Federal Government (A.R.S. § 42–1321, subsec. B, par. 1) and, therefore, were taxable.

This tax assessment relates to sales by plaintiff under 72 separate purchase orders issued to it by a number of different manufacturers, identified as contracts 1 through 63 by the parties, and categorized as follows:

I  Occurring after July 1, 1956, and marked "Sales for Resale"
   Tax: $15,154.81

II  Occurring after July 1, 1956, and containing no resale designation.
    Tax: $ 4,176.31

III  Occurring after July 1, 1956, and marked "not for resale"
     Tax: $ 2,290.93

IV  Occurring prior to July 1, 1956, and marked "Sales for Resale"
    Tax: $ 8,680.17

V  Occurring prior to July 1, 1956, and containing no resale designation.
   Tax: $   846.43

VI  Occurring prior to July 1, 1956, and marked "not for resale"
    Tax: $ 1,568.98

The lower court found for plaintiff on all sales after July 1, 1956, (Categories I, II and III above) in the amount of $21,602.-15 (the contested original assessment was reduced $19.90 by agreement to reconcile mathematical differences) and found for the commission on all sales prior to July 1, 1956. (Categories IV, V and VI above) in the amount of $11,095.58. It must be assumed from this finding that in the opinion of the lower court all sales were made direct to the United States Government by plaintiff.

The first issue presented is whether the plaintiff made the sales directly to the United States Government as the final consumer.

As pointed out in plaintiff's brief, the decision in State Tax Commission v. Graybar Electric Co., 86 Ariz. 253, 344 P.2d 1008 (1959), offers no help to the question here. Though Graybar represented essentially the same type of transactions as presented here, the sales occurred after July 1, 1956, and the court did not decide whether the sales were made directly to the United States or were sales for resale since in either event they would be exempt. The question, however, is not an uncommon one and has been litigated in a number of our sister states, with apparent conflicting results upon similar facts.

In one of the earliest cases considering the question, State of Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, (1941) a "cost-plus-a-fixed-fee" Government Contractor procured lumber from a vendor in performance of a contract which provided title vested in the United States upon delivery, inspection and acceptance by the United States at the building site, and the contractor would be reimbursed by the United States for its cost, including tax, and that the United States maintain control over the actions of the contractor. The Government alleged that the contractor so acted for the United States as to place the United States in the role of the purchaser, emphasizing the title passing, control, inspection and approval. The court held

the sale was not made to the Government directly or to the contractor as an agent of the Government. The court looked to the terms of the contract and the rights and obligations of the parties under it in reaching its decision. It noted the contractor purchased in his own name, on his own credit and the Government was not bound by the purchase even though obligated to reimburse the contractor. The court stated as to the Government's control:

"But however extensively the Government may have reserved the right to restrict or control the action of the contractors in other respects, neither the reservation nor the exercise of that power gave to the contractors the status of agents of the Government to enter into contracts or to pledge its credit." 314 U.S. 13, 62 S.Ct. 47.

And as to the title passing to the Government, the court stated:

"The circumstances that the title to the lumber passed to the Government on delivery does not obligate it to the contractor's vendor under a cost-plus contract more than under a lump sum contract." 314 U.S. 13–14, 62 S.Ct. 47.

In a later case, Kern–Limerick Inc., v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L. Ed. 546 (1954) wherein the prime contractor purchased tractors pursuant to a cost-plus-fixed-fee prime contract with the Government, a similar property clause stated "[t]itle to all such * * * equipment, the cost of which is reimbursable to the Contractor hereunder, shall pass directly from the vendor to the Government without vesting in the Contractor * * * ", it was held that the United States was the purchaser. The Court in looking at the terms of the contract noted that the following clause was included which distinguished it from the contract in the King & Boozer (supra) case and therefore, that case was not controlling:

"The Contractor shall act *as the purchasing agent of the Government* in affecting such procurement and the Government shall be directly liable to

the vendors for the purchase price." 347 U.S. 112, 74 S.Ct. 405, (Margin 2) (Emphasis supplied.)

In Tawes v. Aerial Products, 210 Md. 627, 124 A.2d 805, 809 (1956) wherein both United States Army and United States Navy contracts were considered, the Navy contracts contained a title clause stating:

" * * * facilities shall be purchased in the name and for the account of the Government. *Title to all of the facilities shall be and remain in the Government,* it being understood and agreed that the title to all materials, parts, assemblies, subassemblies, supplies, equipment and other property for the cost of which the Contractor is entitled to be reimbursed under this contract shall automatically pass to and vest in the Government upon delivery to the Contractor for the account of the Government * * *." (Emphasis not ours.)

The purchase orders issued under said Navy contracts stated "[t]his material is purchased for the account of the U. S. Government"

Aerial Products asserted the Government was the purchaser and the court agreed stating:

"We are therefore of the opinion that, although Aerial was not specifically named in the Navy Contract as the purchasing agent of the Government, under the contract and testimony it was in fact the purchasing agent and, therefore, is exempt from the sales tax on the purchases made pursuant to the Navy contract * * *." Tawes v. Aerial Products, 210 Md. 627, 640, 124 A.2d 805, at page 812.

When considering the Army contract however, the court reached a different result on the basis the contract stated "acquire * * * for resale to the Government" and the title clause contained in the Army contract recited:

"Title to all property purchased by the Contractor, for resale to the Gov-

ernment, for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to and vest in the Government upon delivery of such property by the vendor."

The court, even though title vested in the Government upon delivery, held these sales to Aerial Products were for resale to the Government.

In a subsequent Maryland case, Comptroller of the Treasury v. Glenn L. Martin Co., 216 Md. 235, 140 A.2d 288 (1958), decided by the same court upon essentially the same facts as the Army contract above except the language "for resale to the Government" was not present, the court found a sale for resale.

In Avco Manufacturing Corp. v. Connelly, 145 Conn. 161, 140 A.2d 479 (1958), which is much cited as supporting direct sales to the Government, a clause referring to purchases by the Contractor stated "title vests in the Government upon delivery at vendor's plant." The Connecticut court found sales made by vendors were directly to the United States Government as the purchaser. It is noted, however, that in addition to the title vesting clause a Government bill of lading was used, shipment was paid for by the Government and the contract stated the machinery was to be purchased on behalf of the United States and would be Government owned.

In other situations where the courts have found a direct sale was made by the vendor to the United States Government additional facts were found by the court, other than property title clause, which implied a business relationship wherein the Government was the purchaser. General Motors Co. v. State Commissioner of Revenue & Tax, 182 Kan. 237, 320 P.2d 807 (1958) (Government bills of lading, shipment paid for by the Government); United States v. Livingston, D.C., 179 F.Supp. 9 (funds furnished by Government).

█ Although no general rule can be formulated as to when a sale to a Government contractor is or is not a direct sale

to the United States Government, we hold the key to be that in addition to a "title vests in the Government upon delivery by the vendor" clause there must exist some fact showing the Government intended the Contractor to procure the items on behalf of the Government, some facts indicating an authority coming from the Government which makes the Contractor a procuring agent for the Government.

■ With this in mind we have examined the purchase orders for special tooling issued to the plaintiff, and the portions of the purchaser's next higher tier contracts that have been entered in evidence. We note that nothing more is found than what exists in Contract No. 10—a title clause in a cost-plus-fixed-fee prime contract that title to all property purchased by the contractor shall pass to and vest in the Government upon delivery of such property by the vendor, or Contract No. 59—title to the articles purchased hereunder shall pass directly from the seller to the Government at point of delivery. As we have stated, this is not enough in and of itself to establish a direct sale to the United States. We further note that in fact many of the purchase orders were issued pursuant to fixed-price higher tier contracts which do not contain such title vesting clause. Still further, we note that a number of the purchase orders actually contain language denoting the items were procured for resale, i. e. Contract 18, which states " * * * special tooling ordered hereunder shall, after acquisition of title thereto by the buyer * * *"; Contract 26 states " * * * special tools * * become the property of Boeing Airplane Company and pursuant to the provisions of Boeing's prime contract with the Government * * * upon title vesting in Boeing, it will immediately thereafter vest in the *United States Government*, * * *; Contract Nos. 57(a) and 57(b) are purchase orders issued by General Mills, Inc., a subcontractor to prime contractor Western Electric Company, wherein General Mill's contract with Western Electric states that

title to tooling shall vest in Western Electric on delivery to General Mills by General Mills' source; Contract Nos. 46, 47, and 48 do not even indicate a Government contract is involved.

We therefore hold that since the purchase orders (contracts) in question were entered into in the name of the contractor, on the contractor's credit and with nothing more denoting that the contractor acted for the United States than in most instances a Government contract number, some limited Government control, and in some instances title vesting immediately in the Government, that the sales were not direct sales to the Government. As such the trial court's finding is reversed on this issue.

We must now determine whether the special tooling sales were made at retail to the final consumer and therefore are taxable, or whether they were made for subsequent resale and therefore are not taxable.

■ We find no problem with the sales in Categories III and VI, above. Since these sales are designated "not for resale" by the purchaser, they are taxable as sales at retail to the final consumer.

Those sales in Categories I and IV, above, designated "sales for resale" are more difficult. All gross receipts (sales) are presumed to be taxable until the contrary is established. A.R.S. § 42–1329. The burden of showing a sale is not at retail is upon the seller unless he has taken a resale certificate from the buyer containing the minimum statutory requirements. A.R.S. § 42–1328.

■ It cannot be said, upon examination of the contracts in evidence, that in all cases the designations "sales for resale" meet the statutory requirements of a resale certificate sufficient to shift the burden of proof to the commission. Said designations are, however, strong evidence rebutting the presumption that the sales were at retail. This fact, coupled with the presence of Government contract numbers, Government inspection, and Government con-

trol through the application of various contract clauses referring to the Government, and express language that the Government will ultimately receive title; all of which are found totally or in part in the contracts designated "for resale", leads us to the conclusion that these sales were in fact sales for resale and therefore are not taxable.

■ The situation is different, however, concerning those contracts without any resale designation (Categories II and V above). They are presumed to be sales at retail and therefore taxable. The absence of a resale designation leaves us only the actual contract language to consider to determine if the presumption is rebutted. We find in contracts number 25, 27a, 27b, and 42, insufficient facts to overcome the presumption of a retail sale. The fact that a Government contract number appears on these contracts does not persuade us. We find no indication that title to the tools procured will ultimately vest in the Government. As to the other contracts in Categories II and V, we find sufficient contract language to indicate that the ultimate consumer will be the Government to hold that these are sales for resale and therefore not taxable, notwithstanding there is no resale designation.

We hold that $25,300.84 of the special tooling tax paid under protest by the plaintiff was improperly assessed by the Commission.

We therefore find judgment for the plaintiff regarding special tooling sales in the amount of $25,300.84, less $19.90 which the plaintiff conceded to resolve mathematical differences should it lose on any issue; and for the commission in the amount of $7,416.79 plus $19.90.

The judgment of the trial court is affirmed insofar as it relates to the sales involving the dirigible envelopes, tax assessment of $24,840.69, and is reversed insofar as it relates to the tax assessment of $589.44

involving the materials used in the destruction tests. The judgment in favor of the plaintiff in the special tooling sales is fixed in the sum of $25,280.94.

We find judgment in the total amount of $50,121.63 for the plaintiff, and in the total amount of $8,026.13 for the commission. Therefore, of the $58,147.76 paid under protest, $50,121.63 shall be returned by the Commission to the plaintiff with 6% interest from the date of the payment under protest, June 30, 1959.

STEVENS, C. J., and CAMERON, J., concurring.