272 P.3d 1055

**VAL–PAK EAST VALLEY, INC.,**
an Arizona corporation,
Plaintiff/Appellant,

v.

**ARIZONA DEPARTMENT OF REV-
ENUE, an agency of the State of
Arizona, Defendant/Appellee.**

No. 1 CA–TX 10–0005.

Court of Appeals of Arizona,
Division 1, Department C.

March 13, 2012.

Mooney, Wright & Moore, PLLC By Paul J. Mooney and Jim L. Wright, Mesa, and Silver Law PLC By Stephen E. Silver and Jason M. Silver, Scottsdale, Co–Counsel for Plaintiff/Appellant.

Arizona Constitution, the Honorable Michael D. Ryan, Retired Justice of the Arizona Supreme Court, was designated to sit in this matter. Before his untimely death on January 30, 2012,

Justice Ryan fully participated in this case, including oral argument, and concurred in this opinion's reasoning and result.

Thomas C. Horne, Attorney General By Scot G. Teasdale, Assistant Attorney General, Phoenix, Attorneys for Defendant/Appellee.

NORRIS, Judge.

¶ 1 The issue in this appeal is whether an Arizona taxpayer in the business of selling cooperative direct mail advertising is subject to Arizona's use tax. Under the facts presented here, the answer is "no."

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Val–Pak East Valley, Inc., ("Val–Pak") an Arizona corporation, is in the business of selling direct mail advertising. Val–Pak is a franchisee of Val–Pak Direct Marketing Systems, Inc. ("Val–Pak Florida"), a Florida based corporation. Val–Pak representatives sell direct mail advertising to its clients, unrelated Arizona businesses. These businesses include, for example, exterminators, nail salons, dentists, and pizza parlors. The advertising promotes the services and products offered by Val–Pak's clients and is printed on advertising flyers, inserts, and coupons (collectively, "coupons"). Pursuant to its franchise agreement with Val–Pak Florida, Val–Pak obtains product and appearance information (business logos, addresses, telephone numbers, incentive offers, paper colors and types, etc.) from its clients and submits that information to Val–Pak Florida. Val–Pak Florida then designs, prints, compiles, and inserts the coupons ordered by Val–Pak's clients into envelopes. Val–Pak Florida delivers the envelopes to the United States Postal Service for mailing to Arizona addresses in particular "zones," as selected by Val–Pak's clients.[1] Each Arizona addressee receives a single envelope by direct mail containing coupons from more than one Val–Pak client. The term for Val–Pak's business—cooperative direct mail advertising—is, thus, aptly descriptive.

¶ 3 Val–Pak Florida purchases all of the paper stock and other supplies it uses in preparing and printing the coupons. It bills Val–Pak for printing (which includes the design and layout work) and inserting the coupons into the envelopes. It also bills Val–Pak for other "job-related charges" such as transportation, postage, and envelopes. Val–Pak Florida does not separately charge Val–Pak for the paper and other supplies (ink, for example) it uses to print the coupons.[2]

¶ 4 The Arizona Department of Revenue conducted a use tax audit of Val–Pak for the period November 1, 2000 through May 31, 2004. It asserted Val–Pak had purchased and used printed materials in Arizona subject to the use tax, *see generally* Ariz.Rev.Stat. ("A.R.S.") §§ 42–5151 to –5168 (2006), and assessed a use tax of $314,790.21 plus interest and penalties. In making its assessment, the Department asserted the entirety of each transaction between Val–Pak and Val–Pak Florida was subject to the use tax.[3] Val–Pak protested the assessment. An administrative law judge upheld the assessment but abated the penalties. Val–Pak appealed the admin-

---

1. Val–Pak Florida assigns a Val–Pak franchisee to a particular territory. Each territory contains certain designated zones.

2. By affidavit, Val–Pak's President testified the paper and supplies accounted for no more than 9% of Val–Pak Florida's charges. The Department argued to the superior court that it should not consider this testimony because it lacked foundation, was irrelevant, and amounted to hearsay. *See generally* Ariz. R. Civ. P. 56(e) (affidavit supporting or opposing summary judgment "shall set forth such facts as would be admissible in evidence"). The record does not reflect whether the superior court ruled on the admissibility of this testimony in granting summary judgment for the Department. The record, however, does reflect Val–Pak's President obtained this information from Val–Pak Florida

and, thus, at a minimum the Department's hearsay objection may have been well taken. Accordingly, we have not considered this testimony in resolving the issues presented on appeal. *Cf. Airfreight Express Ltd. v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 112, ¶ 26, 158 P.3d 232, 241 (App.2007) (evidentiary deficiencies in affidavit supporting motion for summary judgment can be waived by failure to object or move to strike).

3. Thus, for example, the Department assessed the use tax on all of the charges Val–Pak Florida billed to Val–Pak in May 2003. The invoice for that month reflected total charges of $178,365.70. Of that sum, Val–Pak Florida billed Val–Pak $60,813.29 for postage, $5,170.50 for addressing (which included "Ink Jet" and "Processing"), and $80,819 for printing (including "Layout[ ]").

istrative law judge's decision upholding the assessment to the tax court, which was obligated to "hear and determine the appeal as a trial de novo." A.R.S. § 42–1254(D)(3) (2006). On cross-motions for summary judgment, the tax court upheld the assessment, ruling that Val–Pak Florida was providing printed material and not just a service to Val–Pak because the coupons were of use to Val–Pak's clients.

## DISCUSSION

¶ 5 As it did in the tax court, Val–Pak argues it is not subject to the Arizona use tax because it is purchasing services from Val–Pak Florida and is not using or consuming the coupons printed by Val–Pak Florida in Arizona. The Department, as it also did in the tax court, views what Val–Pak does and its business arrangement with Val–Pak Florida very differently. As the Department sees the situation, Val–Pak purchases advertising material—specifically, coupons—from Val–Pak Florida and then uses the coupons in Arizona. It argues the "entire contractual arrangement is set up to produce and distribute tangible personal property in the form of mailings of printed advertisements."

¶ 6 In support of their respective arguments, the parties spar over the application and meaning of two use tax decisions issued by this court, *Qwest Dex, Inc. v. Arizona Department of Revenue*, 210 Ariz. 223, 109 P.3d 118 (App.2005), and *Service Merchandise Co. v. Arizona Department of Revenue*, 188 Ariz. 414, 937 P.2d 336 (App.1996). In *Qwest*, we held the use tax was inapplicable to out-of-state printing services obtained by an Arizona taxpayer in the business of publishing telephone directories; in *Service Merchandise*, we held the use tax was applicable to advertising materials prepared at the taxpayer's direction and distributed by out-of-state printers for the taxpayer's use in Arizona.

¶ 7 As is perhaps obvious from this brief description of these two decisions, Val–Pak argues *Qwest* controls this case while the Department argues *Service Merchandise* does. Thus, each side attempts to shoehorn the facts of this case into the facts and the holding of the particular case it thinks helps

its cause. In our view, rather than start with case law to resolve the arguments presented here, our beginning point should be the wording of the Arizona use tax statutes. We exercise de novo review as the arguments presented by the parties present issues of law. *City of Peoria v. Brink's Home Sec., Inc.*, 226 Ariz. 332, 333, ¶ 6, 247 P.3d 1002, 1003 (2011) (quotation omitted) (especially important in tax cases to begin with words of the operative statute); *State v. Hansen*, 215 Ariz. 287, 289, ¶ 6, 160 P.3d 166, 168 (2007) (de novo review for issues of law). In so doing, we read the statutory provisions " 'to gain their fair meaning, but not to gather new objects of taxation by strained construction or implication.' " *Brink's Home Sec.*, 226 Ariz. at 333, ¶ 6, 247 P.3d at 1003 (quoting *Ariz. State Tax Comm'n v. Staggs Realty Corp.*, 85 Ariz. 294, 297, 337 P.2d 281, 283 (1959)).

¶ 8 Section 42–5155(A) imposes a tax on "the storage, use or consumption in this state of tangible personal property purchased from a retailer or utility business, as a percentage of the sales price." Every person "storing, using or consuming in this state tangible personal property purchased from a retailer or utility business" is liable for this tax. A.R.S. § 42–5155(E). The statutory scheme defines the terms "retailer," "purchase," "storage," and "use or consumption." A.R.S. § 42–5151. A retailer includes "[e]very person engaged in the business of making sales of tangible personal property for storage, use or other consumption." A.R.S. § 42–5151(17)(a). "Purchase" means "any transfer, exchange or barter, conditional or otherwise, in any manner or by any means, of tangible personal property for a consideration." A.R.S. § 42–5151(13). "Storage" means "keeping or retaining tangible personal property purchased from a retailer for any purpose except sale in the regular course of business or subsequent use solely outside this state." A.R.S. § 42–5151(18). And, "use or consumption" means "the exercise of any right or power over tangible personal property incidental to owning the property except holding for sale or selling the proper-

ty in the regular course of business."[4] A.R.S. § 42–5151(20).

¶ 9 Viewing these statutory provisions and definitions as an integrated whole, the Department was thus entitled to impose a use tax on Val–Pak if it purchased tangible personal property (according to the Department, the coupons) from a retailer (according to the Department, Val–Pak Florida) and then stored, used, or consumed this property in Arizona.

¶ 10 We now come to what should be easy, but is not. Although tangible personal property is often easy to spot-think of an apple, an automobile, or a television-when the item is largely the product of personal services, characterization becomes more difficult. What about an advertising flyer that involves significant design and creative labor? The value and cost of the paper on which the flyer is printed may pale in comparison to the value and cost of the design and creative labor that went into it. *See generally* Walter Hellerstein, *State Taxation,* ¶ 12.08 (3rd ed. 2011) ("Hellerstein"). So, what is being sold—tangible personal property (taxable) or a service (nontaxable)? Answering this question is made more difficult by the reality "that most transactions, to a certain degree, involve some amount of personal service and some amount of tangible property." *New England Tel. & Tel. Co. v. Clark,* 624 A.2d 298, 300 (R.I.1993).

¶ 11 To try to draw the taxable line in a mixed transaction, that is, one involving both tangible personal property and services, we have identified three possible scenarios: first, the service is the primary object of the transaction and the property is incidental to or an inconsequential element of the service and not separately charged; second, the tangible personal property is the primary object of the transaction and the service is incidental to the property acquired and not separately charged; and third, the property and service are distinct and each is a consequential element of the transaction and can be readily separated. In the first, the sale is all nontaxable; in the second, the sale is all taxable; and in the third, the property, but not the service component, is taxable. *Goodyear Aircraft Corp. v. Ariz. State Tax Comm'n,* 1 Ariz.App. 302, 306–07, 402 P.2d 423, 427–28 (1965) (transaction privilege tax).

¶ 12 Here, Val–Pak argues it fits the first scenario because it is primarily purchasing printing and design services from Val–Pak Florida and the paper Val–Pak Florida uses for the coupons is only an incidental part of the transaction. The Department argues, however, that Val–Pak fits the second scenario because it is primarily purchasing paper (coupons) and the services it receives from Val–Pak Florida are only incidental. To decide whether a transaction fits in the first or second scenario, we apply two tests: the "dominant purpose," also known as the "true object" test, and the "common understanding" test. *See generally Qwest,* 210 Ariz. at 226, ¶ 17, 228, ¶ 23, 109 P.3d at 121, 123.

■ ¶ 13 As its name suggests, under the "dominant purpose" test, a court decides whether the transaction is all taxable or all nontaxable by identifying the dominant purpose of the transaction. Although this test has been harshly criticized by courts and commentators because it often leads to inconsistent results, it is nevertheless a recognized method of deciding taxability. *See generally id.* at 226–27, ¶ 17, 109 P.3d at 121–22.

■ ¶ 14 Applying this test here, we conclude the dominant purpose of Val–Pak's business dealings with Val–Pak Florida is to obtain design, mailing, and printing services, not tangible personal property. The facts in this case establish Val–Pak is, in essence, a "broker" of direct mail advertising services. It sells advertising services to its customers and obtains these services from Val–Pak Florida. The invoices sent by Val–Pak Florida to Val–Pak demonstrate this. As discussed, these invoices itemize what Val–Pak is paying for, and show Val–Pak is paying for design, printing, and mailing services.

---

4. The use tax statutes do not define "tangible personal property." The transaction privilege tax statutes, however, define "tangible personal property" as "personal property which may be seen, weighed, measured, felt or touched or is in any other manner perceptible to the senses." A.R.S. § 42–5001(16) (2006).

Simply put, by itself, the paper is of little practical value to Val–Pak without Val–Pak Florida's design, printing, and mailing services. *See generally Washington Times– Herald v. District of Columbia,* 213 F.2d 23, 24 (D.C.Cir.1954) (sale of one-time-use cartoon mats constituted sale of professional and personal services rather than sale of mats because their value when blank was inconsequential compared with their value after artwork was complete).

¶ 15 Under the "common understanding" test, whether a mixed transaction is all taxable or all nontaxable is determined by the "common understanding of whether a trade, business, or occupation involves selling products, on the one hand, or rendering services ... on the other." Hellerstein ¶ 12.08[2]; *see also Qwest,* 210 Ariz. at 228, ¶ 23, 109 P.3d at 123. As Hellerstein explains,

> [s]ince sales tax statutes affect virtually every person within the taxing jurisdiction in everyday transactions, we believe that there is merit to a rule that looks to the understanding that the average individual or business purchaser would attribute to such basic statutory terms as "sale" and "service." ... We therefore favor the rule that statutory language "should be given its ordinary and common significance" in distinguishing between what constitutes a sale of tangible personal property and what constitutes the sale of a service.... This rule is simply the application of the view embraced by many courts that "words in a statute are to be given their common meaning."

Hellerstein ¶ 12.08[2] (citations omitted). Thus we "attempt to identify characteristics of the transaction at issue that make it either more analogous to what is reasonably and commonly understood to be a sale of goods, or more analogous to what is generally understood to be the purchase of a service or intangible right." *City of Boulder v. Leanin' Tree, Inc.,* 72 P.3d 361, 365–66 (Colo.2003) (citing cases).

¶ 16 Applying this test here, we conclude Val–Pak is buying services, not tangible personal property, from Val–Pak Florida. Val–Pak is in the cooperative direct mail advertising business. Although people buy paper every day, no one would think Val–Pak is in the business of buying paper and then selling paper to its clients. As discussed, paper qua paper has little value to Val–Pak. Only when Val–Pak Florida takes blank paper and designs, creates, and transforms the paper into coupons promoting sales of pizza, dental services, and the like for Val–Pak's clients does Val–Pak receive what it has ordered from Val–Pak Florida. That the services provided by Val–Pak Florida to Val–Pak allow Val–Pak to meet its obligations to its clients, and are of value to Val–Pak's clients, and may be of value to the ultimate recipients (if they use the coupons to buy the pizza or have their teeth fixed), does not endow the transaction between Val–Pak and Val–Pak Florida with the customary and commonly understood characteristics of a sale of tangible personal property.

¶ 17 We then come to the parties' dispute over *Qwest* and *Service Merchandise.* In our view, neither case controls the result here.

¶ 18 In *Qwest,* the Arizona taxpayer was in the business of publishing telephone directories. It contracted with out-of-state printing companies to print the directories; it separately contracted with out-of-state paper mills, however, for the paper which the mills then furnished to the printing companies. The taxpayer allowed the printing companies to accept and pay for the paper on its behalf. The printing companies printed the directories and shipped them to the taxpayer in Arizona. The printing companies billed the taxpayer for their printing services and separately requested reimbursement from the taxpayer for the cost of the paper. The taxpayer argued it was only subject to the use tax on the paper while the Department asserted the taxpayer owed the use tax on all components of the directories—paper and printing. *Qwest,* 210 Ariz. at 224–25, ¶¶ 2–6, 109 P.3d at 119–20. Relying on *Goodyear,* we rejected the Department's argument and held the printing services were not subject to the use tax:

> [W]e find that the act of printing the directories and the finished product (the physical directories) are distinct and easily sepa-

rated. The cost is easily separated as Taxpayer (or the printers on behalf of Taxpayer) purchased the paper from another source and paid the paper source for the cost of the paper. The printers charged a fee for the printing of the directories, which was separate and distinct from the cost of the paper. Also, the transaction itself is easily separated into two transactions since one company provided the paper and a wholly different company provided the printing service. Moreover, the cost of the paper in this case was inconsequential to the cost of printing the directories.

*Id.* at 227–28, ¶ 20, 109 P.3d at 122–23.

¶ 19 As we understand its argument, Val–Pak believes *Qwest* broadly holds the use tax is not applicable to services provided by out-of-state printers to Arizona taxpayers. The Department—obviously not happy with the result in *Qwest*—argues the case does not stand for this broad rule and, indeed, notes the case did not even involve a situation in which services and tangible personal property were truly mixed as the taxpayer there, not the out-of-state printers, provided the paper. The Department thus takes us to task for even discussing in *Qwest* the "dominant purpose" and "common understanding" tests because those tests, it argues, only apply to "bundled" transactions—transactions that incorporate both services and tangible personal property and which cannot be "disaggregated" into taxable and nontaxable components.[5]

¶ 20 We agree with the Department that *Qwest* does not control the result in this case. As the Department points out, *Qwest* presented and properly applied the third scenario discussed in *Goodyear*—a transaction partly taxable and partly nontaxable because it involved property and services that were distinct and "capable of ready separation." *See Goodyear*, 1 Ariz.App. at 306, 402 P.2d at

427. Essentially, *Qwest* can be viewed as presenting two transactions. In one, the taxpayer purchased tangible personal property, the paper, from the paper mills, and in the other, it purchased printing services from the printing companies. Thus, it was easy to separate services from paper, much like the situation presented in *Goodyear*. In contrast, the facts here do not lend themselves to the type of easy separation of property from services as was presented in *Qwest*.

¶ 21 In this case, the admissible evidence in the record reflects the transaction between Val–Pak and Val–Pak Florida was, as the Department would characterize it, "bundled."[6] As Val–Pak's President acknowledged, Val–Pak purchased from Val–Pak Florida "pretty much a turn-key product" and received the paper and printing "all together as, basically, a package deal." Although we have concluded Val–Pak is not subject to the use tax on its purchases from Val–Pak Florida under the dominant purpose and common understanding tests, we nevertheless agree with the Department *Qwest* does not address or control the situation presented here.

¶ 22 That leaves us with the Department's reliance on *Service Merchandise*. According to the Department, that case adopted a broad rule that any in-state use by a taxpayer of advertising material printed out-of-state is subject to the use tax. We disagree with the Department's reading of this case. As we explain, in making this argument the Department is divorcing the facts of the case from the explicit requirements of the use statute.

¶ 23 In *Service Merchandise*, the taxpayer designed its advertising catalogs and flyers out-of-state. It decided how many catalogs and flyers it would produce, what products it would advertise, when its advertising materials would be printed and distributed, and

---

5. In criticizing *Qwest*, the Department relies, in part, on the criticisms aimed at *Qwest* in Hellerstein. *See* Hellerstein, ¶ 12.08[2][a], nn. 213–223.

6. A "bundled transaction" has been described as one in which the services become an integral part of the property such as when an artist's skill and labor become embodied in a painting he or she creates. *Cal. State Bd. of Equalization v. Advance Sch., Inc.*, 2 B.R. 231, 235 (Bankr. N.D.Ill.1980). It has also been described as a transaction in which goods and services are "inextricably intertwined in a single sale." *Dell, Inc. v. Superior Court*, 159 Cal.App.4th 911, 71 Cal.Rptr.3d 905, 913 (2008) (quotation omitted).

who would receive them. The taxpayer hired out-of-state printers to print and distribute the catalogs and flyers to recipients in Arizona. The taxpayer argued the use tax was inapplicable to the "price it paid to out-of-state printers to produce" the materials because it was not "using" the materials in Arizona. 188 Ariz. at 415–16, 937 P.2d at 337–38. We rejected that argument. After explaining that use and consumption are defined by statute as the "exercise of any right or power over tangible personal property incidental to owning the property," we held the distribution of the catalogs and flyers in Arizona was a use by the taxpayer incidental to its ownership of the materials:

> [The taxpayer] contracted for the right to have the catalogs distributed to specified Arizona customers at particular times during the year. Although the distribution contracts were consummated outside Arizona, the rights to control when, where, how, to whom and whether the catalogs would be delivered were exercised in Arizona through [the taxpayer's] agents. We see no reason to treat [the taxpayer] differently for tax purposes merely because it employed agents to do in Arizona what it could have done itself.

*Id.* at 416, 937 P.2d at 338.

¶ 24 The pivotal facts in *Service Merchandise*—which the Department glosses over here—demonstrate the taxpayer there was exercising rights and powers over tangible personal property incidental to *its* ownership of that property. We emphasized this critical point in a subsequent case, *Sharper Image Corp. v. Arizona Department of Revenue*, 191 Ariz. 475, 957 P.2d 1369 (App.1998). In *Sharper Image*, the taxpayer was using out-of-state printers to prepare and mass mail its advertising catalogs to Arizona recipients. As in *Service Merchandise*, the *Sharper Image* taxpayer determined what products it would advertise in its catalogs, created and designed the catalogs, and decided how often, how many, when, where, and to whom the catalogs would be sent. Instead of arguing it was delivering its catalogs through "agents" as the taxpayer had done in *Service Merchandise*, it argued it was delivering them to Arizona recipients through the Unit-

ed States Postal Service which, as a matter of law, could not be considered its agent. We rejected this distinction explaining:

> The determinative fact in *Service Merchandise* was that the non-Arizona taxpayer there accomplished intended dispositions of *its personal property in Arizona through other entities acting on its behalf,* as its surrogates, instrumentalities, proxies, or, loosely, "agents." The details of principal-agent and master-servant law were accordingly immaterial there. They are likewise immaterial here.

*Id.* at 477, ¶ 12, 957 P.2d at 1371 (emphasis added).

¶ 25 Thus, in both *Service Merchandise* and *Sharper Image* the taxpayers were exercising rights "incidental to owning the property." Although the use tax statute does not define or describe the meaning of the phrase "incidental to owning the property," on its face this wording requires the exercise of a right or power that one has to tangible personal property by virtue of owning it. Here, Val–Pak does not own the coupons. Under the franchise agreement, Val–Pak Florida, not Val–Pak, retains and exercises complete control over each item in each envelope it distributes and mails to the Arizona addressees. And, indeed, as counsel for the Department acknowledged to this court in oral argument, Val–Pak Florida is the owner of the coupons until they are received by these addressees. Under these circumstances, Val–Pak is not exercising "any right or power over tangible personal property incidental to owning the property."

¶ 26 At oral argument, the Department nevertheless argued Val Pak is making an "economic use" of the coupons because it is selling the advertising printed on the coupons to its clients and this use is sufficient for purposes of our use statute. But, this type of use is not what the use statute requires. The Arizona use statute only applies if the taxpayer exercises "any right or power over tangible personal property incidental to owning the property." *See* A.R.S. § 42–5151(20). We cannot gloss over the statutory

requirement that a taxpayer's use must be incidental to owning the property.[7]

¶ 27 In *Service Merchandise*, there was no question the taxpayer owned the catalogs and, therefore, its use was incidental to owning the property. Because the facts are different here, *Service Merchandise* is not controlling and we reject the broad, categorical rule the Department argues that case established.[8]

## CONCLUSION

¶ 28 For the foregoing reasons, we hold Val–Pak is not subject to the Arizona use tax under the circumstances presented here. We therefore reverse summary judgment in the Department's favor and remand to the tax court for entry of judgment in Val–Pak's favor. We award Val–Pak its reasonable attorneys' fees and expenses on appeal pursuant to A.R.S. § 12–348(B)(1) as well as costs on appeal subject to its compliance with Rule 21(c) of the Arizona Rules of Civil Appellate Procedure.[9]

CONCURRING: MICHAEL J. BROWN, Presiding Judge and PHILIP HALL, Judge.

7. The statutory requirement of "incidental to owning the property" is a distinctive feature of Arizona's use tax. Without it, the Department's "economic use" argument would have more force. *Compare Val–Pak of Cent. Conn. N., Inc. v. Comm'r of Revenue Servs.*, 44 Conn.Supp. 133, 670 A.2d 343, 347 (1994), *aff'd*, 235 Conn. 737, 669 A.2d 1211 (1996) (Val–Pak franchisee not subject to use tax because it did not exercise any right or power "incident to the ownership of" tangible personal property), *with Val–Pak of Omaha, Inc. v. Dep't of Revenue of Neb.*, 249 Neb. 776, 545 N.W.2d 447, 449–50 (1996) (Val–Pak franchisee subject to use tax under statute that defined use as either right or power over personal property incident to ownership or possession, and regulation with statutory effect that deemed advertising agencies to be the "ultimate consumer[s]" of all material and services they purchased).

8. The Department argues we should defer to a "substantive policy statement," also known as a "tax ruling," it issued in April 2002 that concluded the use tax applies to purchases of printed items from an out-of-state printer who mails the items to Arizona addresses at the purchaser's direction. *See* Arizona Use Tax Ruling UTR 02–1. The tax ruling also concluded the tax base included the total purchase price for the property purchased from the printer, including any services that were part of the sale, notwithstanding that the printer may have separately itemized the charges on the invoice. The ruling relied on our decision in *Service Merchandise*. Although ordinarily we defer to an agency's interpretation of a statute it must administer, a substantive policy statement, as UTR 02–1 explicitly states, is "advisory only." *See also* A.R.S. § 41–1001(20) (2004). Further, to the extent this substantive policy statement conflicts with our interpretation and application of the governing statutes, it is not controlling.

9. Given our analysis of the foregoing issues, we need not address the other arguments raised by the parties on appeal.